1   **SCHONBRUN SEPLOW HARRIS**
    **HOFFMAN & ZELDES, LLP**
2   Helen I. Zeldes, Esq. (SBN 220051)
    *hzeldes@sshhzlaw.com*
3   Ben Travis (SBN 305641)
    *btravis@sshhzlaw.com*
4   501 West Broadway, Suite 800
    San Diego, California 92101
5   Telephone: (619) 400-4990

6   **SCHONBRUN SEPLOW HARRIS**
    **HOFFMAN & ZELDES, LLP**
7   Paul L. Hoffman (SBN 71244)
    *hoffpaul@aol.com*
8   John C. Washington (SBN 315991)
    *jwashington@sshhzlaw.com*
9   200 Pier Avenue, Suite 226
    Hermosa Beach, California 90254
10  Telephone: (310) 396-0731

11  **REESE LLP**
    Michael R. Reese (SBN 206773)
12  *mreese@reesellp.com*
    100 West 93rd Street, 16th Floor
13  New York, New York 10025
    Telephone: (212) 643-0500

14
15  [Additional counsel listed on signature page]

16  *Counsel for Plaintiff Renee Walker and the Proposed Class.*

17              **UNITED STATES DISTRICT COURT**

18            **SOUTHERN DISTRICT OF CALIFORNIA**

19                  **SAN DIEGO DIVISION**

20  RENEE WALKER, *individually and*        Case No. 3:19-cv-00723-L-KSC
    *on behalf of all others similarly*
21  *situated*,                             **PLAINTIFF RENEE WALKER'S**
                                            **MEMORANDUM OF POINTS**
22                  Plaintiff,              **AND AUTHORITIES IN**
                                            **OPPOSITION TO DEFENDANT**
23          v.                              **NESTLÉ USA, INC.'S MOTION**
                                            **TO DISMISS SECOND AMENDED**
24  NESTLÉ USA, INC., *a Delaware*          **COMPLAINT**
    *Corporation, and* DOES 1 *to* 100,
25                                          Date: Under Submission
                    Defendants.            Time: Under Submission
26                                          Place: Courtroom 5B
                                            Judge: Honorable M. James Lorenz
27
                                            Complaint served: April 24, 2019
28

1

**TABLE OF CONTENTS**

2   I.    INTRODUCTION ..................................................................................... 1

3   II.   FACTUAL BACKGROUND ...................................................................... 3

4   III.  LEGAL STANDARD ............................................................................... 4

5   IV.   ARGUMENT ........................................................................................... 5

6         A.   Plaintiff's Claims are Based on Affirmative Misrepresentations, not Pure Omissions ............................................................... 5

7         B.   The SAC Plausibly Alleges False and Misleading Statements ........... 6

8              1.   Nestlé's Cocoa Plan is not Helping Improve the Lives of Farmers – the Statement is False and Misleading ........................... 7

9

10             2.   Nestlé's "Certified Through UTZ" Representations and Seals are False and Misleading ................................................ 9

11             3.   Nestle's "Sustainably Sourced" Representations are False and Misleading.................................................................. 11

12

13        C.   Whether A Reasonable Consumer Would be Deceived Is a Factual Issue Not Appropriately Decided on a Motion to Dismiss .... 16

14             1.   Defendant's Statement that its Cocoa is "Sustainably Sourced" Would Deceive a Reasonable Consumer ........................ 16

15

16             2.   Nestlé's Statement that It Helps "Improve the Lives of the Cocoa Farmers and the Quality of Their Products" Would Deceive a Reasonable Consumer.................................................... 19

17

18             3.   Defendant's Use of UTZ on its Labels Would Deceive a Reasonable Consumer.................................................................. 20

19        D.   The Law Does Not Require a Consumer to go to a Website............... 21

20        E.   Plaintiff has Established Article III Standing to Challenge the Labeling of Products she did not Purchase. ..................................... 24

21

22   V.    CONCLUSION ....................................................................................... 25

23

24

25

26

27

28

# TABLE OF AUTHORITIES

*Page(s)*

<u>Federal Cases</u>

*Astiana v. Dreyer's Grand Ice Cream, Inc.*, No. C 11–2910 EMC,
2012 WL 2990766 (N.D.Cal. July 20, 2012) .................................................. 24

*Bailey v. Rite Aid Corporation*,
2019 WL 4260394 (N.D. Cal Sept. 9, 2019) ............................................. 19, 21

*Barber v. Nestlé USA, Inc.*,
154 F. Supp. 3d 954 (C.D. Cal. 2015) .................................................. 6, 8, 9, 20

*Becerra v. Dr. Pepper/Seven Up. Inc.*,
945 F.3d 1225 (9th Cir. 2019) .......................................................... 18

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) ..................................................................... 4, 5

*Brown v. Hain Celestial Group, Inc.*,
913 F. Supp. 2d 881 (N.D. Cal. 2012) .................................................. 17

*Brown v. Starbucks Corp.*, No. 18-cv-2286,
2019 WL 996399 (S.D. Cal. Mar. 1, 2019) ............................................. 22

*Cheslow v. Ghiradelli Chocolate Co.*,
445 F. Supp. 3d 8 (N.D. Cal. 2020) .................................................... 19

*Coe v. Gen. Mills, Inc.*, No. 15-cv-05112-TEH,
2016 WL 4208287 (N.D. Cal. Aug. 10, 2016) .......................................... 21

*Dana v. Hershey Co.*,
180 F. Supp. 3d 652 (N.D. Cal. 2016) .................................................... 5

*Doe I v. Nestlé USA, Inc.*,
766 F.3d 1013 (9th Cir. 2014) .......................................................... 13

*Ebner v. Fresh, Inc.*,
838 F.3d 958 (9th Cir. 2016) ........................................................... 18

*Ehlers v. Ben & Jerry's Homemade Inc.*, No. 2:19-cv-00194,
2020 WL 2218858 (D. Vt. May 7, 2020) ............................................. 9, 10, 25

*Fernandez v. Atkins Nutritionals, Inc.*,
2018 WL 280028 (S.D. Cal. Jan. 3, 2018) ............................................. 21

## TABLE OF AUTHORITIES – CONT'D

*Page(s)*

<u>Federal Cases</u> *(Continued)*

*Figy v. Frito-Lay N. Am., Inc.,*
  67 F. Supp. 3d 1075 (N.D. Cal. 2014) ............................................................. 19

*Foman v. Davis,*
  371 U.S. 178 (1962) ........................................................................................ 25

*Hadley v. Kellogg Sales Co.,*
  273 F. Supp. 3d 1085 ........................................................................................ 8

*Ham v. Hain Celestial Grp. Inc.,*
  70 F. Supp. 3d 1188 (N.D. Cal. 2014) ......................................................... 12-13

*Hodsdon v. Mars, Inc.,*
  891 F.3d 857 (9th Cir. 2018) ............................................................................ 5

*Hughes v. Big Heart Pet Brands, No. 15-cv-08007-CJC-AGR,*
  2016 WL 524057 (C.D. Cal. Jan. 15, 2016) ..................................................... 6

*Jou v. Kimberly-Clark Corp., No. 13-cv-03075-JSC,*
  2013 WL 6491158 (N.D. Cal. Dec. 10, 2013) ................................................. 15

*Kwan v. SanMedica International*
  854 F.3d 1088 (9th Cir. 2017) .................................................................... 13, 14

*L.A. Taxi Coop., Inc. v. Uber Techs., Inc.,*
  114 F. Supp. 3d 852 (N.D. Cal. 2015) ......................................................... 8, 19

*Lam v. Gen. Mills, Inc.,*
  859 F. Supp. 2d 1097 (N.D. Cal. 2012) ........................................................... 19

*Maisel v. S.C. Johnson & Son, Inc.,*
  2021 WL 1788397 (N.D. Cal. May 5, 2021) ................................................... 16

*Maxwell v. Unilever U.S., Inc., No. 12-cv-1736,*
  2018 WL 1536761 (N.D. Cal. Mar. 29, 2018) ................................................. 19

*McCoy v. Nestlé USA, Inc.,*
  173 F. Supp. 3d 954 (N.D. Cal. 2016) .............................................................. 5

*Myers v. Starbucks Corp., No. 5:20-cv-00335-JWH-SHK,*
  2021 WL 1921120 (C.D. Cal. May 5, 2021) ................................................... 14

# TABLE OF AUTHORITIES – CONT'D

*Page(s)*

<u>Federal Cases</u> *(Continued)*

*Myers-Taylor v. Ornua Foods North America, Inc.*,
  2019 WL 424703 (S.D. Cal. Feb. 4, 2019) ...................................................... 23

*Nestlé Cocoa Plan. In Koh v. S.C. Johnson & Son, Inc., No. 09-cv-00927-RMW*,
  2010 WL 94265 (N.D. Cal. Jan. 6, 2010) ........................................................ 12

*Nowrouzi v. Maker's Mark Distillery, Inc.*,
  2015 WL 4523551 (S.D. Cal. July 27, 2015) ................................................... 23

*Painter v. Blue Diamond Growers*,
  757 F. App'x 517 (9th Cir. 2018) ..................................................................... 18

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020) .................................................................. *passim*

*Reilly v. Chipotle Mexican Grill, Inc., No. 15-cv-23425*,
  2016 WL 10644065 (S.D. Fla. Apr. 20, 2016) ................................................... 9

*Rosa v. Tri-Union Seafoods, LLC, No. 15-cv-07540-CJC-AGR*,
  2016 WL 524059 (C.D. Cal. Jan. 15, 2016) ....................................................... 6

*Sandoval v. PharmaCare US, Inc.*,
  730 Fed. App'x 417 (9th Cir. 2018) ................................................................. 16

*Stewart v. Kodiak Cakes, LLC*,
  2021 WL 1698695 (S.D. Cal. Apr. 29, 2021) ................................................... 16

*Swearingen v. Healthy Beverage, LLC, No. 13-cv-04385-EMC*,
  2017 WL 1650552 (N.D. Cal. May 2, 2017) .................................................... 23

*Tomasella v. Nestlé USA, Inc.*,
  962 F.3d 60 (1st Cir. 2020) ............................................................................... 6

*Water & Sanitation Health, Inc. v. Rainforest Alliance, Inc., No. C15-75RAJ*,
  2015 WL 12657110 (W.D. Wash. Dec. 29, 2015) ........................................... 20

*Williams v. Gerber Prods. Co.*,
  552 F.3d 934 (9th Cir. 2008) .................................................................... *passim*

*Williams. Robinson v. Unilever United States, Inc., No. 17-cv-03010-DMG-AJW*,
  2019 WL 2067941 (C.D. Cal. Mar. 25, 2019) ............................................ 22-23

1

# TABLE OF AUTHORITIES – CONT'D

*Page(s)*

*Federal Cases (Continued)*

*Wilson v. Frito-Lay N. Am., Inc.*
   961 F. Supp. 2d 1134 (N.D. Cal. 2013) ............................................. 24

*Wirth v. Mars Inc., No. 15-cv-01470-DOC-KES,*
   2016 WL 471234 (C.D. Cal. Feb. 5, 2016) ........................................ 6

*Workman v. Plum Inc.,*
   141 F. Supp. 3d 1032 (N.D. Cal. 2015) ........................................... 22

*State Cases*

*Hill v. Roll International Corp.,*
   195 Cal. App. 4th 1295 (2011) ...................................................... 21

*Kwikset Corp. v. Superior Court,*
   51 Cal. 4th 310 (2011) ........................................................... 17, 18

*Rubenstein v. The Gap, Inc.,*
   14 Cal. App. 5th 870 (2017) .......................................................... 19

*State Statutes*

Cal. Bus. & Prof. Code § 17200 ..................................................... 4

Cal. Civ. Code § 1750 ............................................................... 4

Cal. Civ. Code § 1760 .............................................................. 16

*Rules*

Fed. R. Civ. P. 12 ............................................................... 4, 10

Fed. R. Civ. P. 15 ................................................................ 25

# I.     INTRODUCTION

It is well-established that Defendant Nestlé USA, Inc. ("Defendant" or "Nestlé") purchases its cocoa from a supply chain in the Côte D'Ivoire that is rife with child and forced labor and is the leading source of rainforest devastation in the region. Children on Ivorian cocoa plantations are subjected to what the International Labor Organization terms the "Worst Forms of Child Labor" – including trafficking, slavery, and exposure to toxic chemicals and hazardous tools.[1] Defendant nevertheless prominently displays the unequivocal claim on its product labels that its cocoa is "sustainably sourced". There is nothing aspirational about this statement. Plaintiff Renee Walker ("Plaintiff" or "Walker") presented evidence in her Second Amended Complaint ("SAC")[2] that consumers make purchasing decisions based on precisely these types of sustainability claims, and that the term "sustainability" includes not just environmental preservation but also fair labor practices. SAC at ¶¶ 22, 67. Defendant's product labels also unequivocally claim that its cocoa products "improve the lives of farmers." Plaintiff's SAC cites Nestlé's own website showing that the incidence of child labor *in its own* cocoa supply chain has gotten worse since it created its "Nestlé Cocoa Plan", which clearly is not helping "improve the lives of the cocoa farmers" as its labels claim. Plaintiff has adequately stated a false and deceptive labeling claim against Defendant.

Defendant's Memorandum of Points and Authorities in Support of its Motion to Dismiss Plaintiff's Second Amended Complaint ("MTD") raises straw man after

---

[1] https://www.ilo.org/ipec/facts/WorstFormsofChildLabour/lang--en/index.htm

[2] Pursuant to this Court's 3/30/21 Order, Plaintiff identifies in her SAC "the products she purchased, and when and where she purchased them." Dkt. 42 at *6. Ms. Walker states that she "regularly purchased Defendant Nestlé's chocolate products (specifically semi-sweet morsels, semi-sweet mini morsels as well as hot cocoa mix) from her local Vons and other grocery stores in Carlsbad, California, labeled with the "Nestlé Cocoa Plan" "UTZ Certified" "Certified through UTZ" and "Sustainably Sourced" labeling on them, purporting to, "Support farmers for better chocolate" and "help improve the lives of cocoa farmers." SAC ¶8. She relied on Nestlé's misrepresentations about the social and environmental benefits of the products in making her decision to purchase them and purchased these products many times in the 4 years prior to filing her complaint in 2019. *Id.* Her most recent purchases were in Jan. – Feb. 2019. *Id.*

straw man argument – which the Court should reject.  First, Defendant claims that "Plaintiff does not deny that the products she purchased were made with cocoa sourced by the Nestlé Cocoa Plan" (MTD at 2) – conveniently excising the lucrative (and deceptive) operative word: ***sustainably*** from the phrase "sustainably sourced." Second, Plaintiff's claims are not based on "frustration with the fact that there is still work to be done to improve cocoa farms in West Africa." (*Id.*).  Plaintiff's claim is that things have gotten ***worse*** since Nestlé started its Cocoa Plan – claiming to be improving the lives of farmers is thus extremely deceptive.  Plaintiff relies on Nestlé's own website – which it attaches to its Motion – among other well-respected sources for these facts.[3]  Similarly, Defendant claims that Plaintiff does not "Deny that UTZ is an independent third party whose objective is to improve farming practices and conditions." (*Id.*).  This is not true.  Plaintiff expressly claims that the UTZ certification is a sham.  Plaintiff cites a study sponsored by Nestlé and UTZ themselves which found that, among other things, there is ***widespread use of child labor on UTZ certified farms*** - children are doing prohibited hazardous or unhealthy work on UTZ certified farms, and there are worse conditions on UTZ certified farms than non-UTZ certified farms.[4]  Defendant's Motion to Dismiss misses the mark.

Nestlé's false and deceptive labeling is plainly intended to capitalize on the lucrative ethical consumer market – chocolate with sustainability claims on their labels outperform those without them more than 3 to 1.[5]  Nestlé's labeling is misleading to a reasonable consumer – no definition of "sustainable" can reasonably be said to include slavery or ecological devastation.  Nestlé's affirmative misrepresentations (*not* omissions) form the basis for Plaintiff's claims for relief.

Nestlé does not seriously challenge Plaintiff's pleadings but rather the hotly disputed ultimate fact issue in the case: whether a reasonable consumer would be

---

[3] See SAC at ¶13, 14, 17, 35, 37, 45, 49,
[4] *See* SAC at ¶¶ 44-47.
[5] *See* SAC at ¶ 24.

1  misled by Nestlé's label statements. This is plainly a question that cannot be

2  answered at this stage in the proceedings. Plaintiff more than adequately stated her

3  claims. Defendant's second Motion to Dismiss should be rejected in its entirety.

4  ## II.    FACTUAL BACKGROUND

5        Nestlé, one of the largest chocolate manufacturers in the world, is a long-

6  standing member of the World Cocoa Foundation and is well-aware of the use of the

7  "Worst Forms of Child Labor" (child and slave labor) in its supply chain in Côte

8  D'Ivoire. SAC ¶¶ 11, 59, ECF No. 44. Despite the various industry commitments

9  made over more than two decades, child labor has increased in Côte D'Ivoire over

10  that period of time. *Id.* at ¶ 14. Nestlé is also aware that the "[c]hocolate industry

11  drives rainforest disaster in [the] Ivory Coast"—that at the current pace of

12  deforestation, there will be no forest left in the Ivory Coast by 2030. *Id.* at ¶ 2.

13        The vast majority of Nestlé's cocoa comes from farms at which child slave

14  labor is commonplace. *Id.* at ¶¶ 41–42, 48–50, 52–56. The practices at such farms

15  are horrific and include the worst forms of child labor: children kidnapped and

16  trafficked, held against their will, locked in living quarters, and beaten if they try to

17  escape. *Id.* at ¶¶ 11, 15–16. The SAC alleges that Nestlé has perpetuated and funded

18  child slavery to obtain cheap, ongoing supplies of cocoa and maintains exclusive

19  supplier/buyer relationships with farms and cooperatives, dictating the terms of

20  production and specifically the labor conditions under which its beans are produced.

21  *Id.* at ¶ 83. Nestlé knowingly purchases from and works with farms using child slave

22  labor (*id.* at ¶¶ 83–84, 86), yet astonishingly labels its products "sustainably

23  sourced." *Id.* at ¶¶ 17, 19–20. In addition, Walker also alleges that Nestlé's products

24  are hardly otherwise "sustainable" or environmentally friendly, but rather cause

25  massive deforestation and environmental destruction. *Id.* at ¶¶ 2, 26–30, 87–91.

26        Seeking to tap the booming market for sustainable products enjoyed by some

27  of its competitors, Nestlé labels the products at issue as "sustainably sourced" and

28  "improv[ing] the lives of farmers" and stamps product labels with logos connoting

sustainability, such as "Nestlé Cocoa Plan," and "UTZ Certified" (a program purporting to promote sustainable farming of coffee and cocoa throughout the world). SAC ¶¶ 17–20, 44. The term "sustainable" encompasses both socially and environmentally responsible labor practices. *Id.* at ¶¶ 22, 67.

Plaintiff alleges such labeling is demonstrably false. For example, *as Nestlé's own statistics show*, child labor has substantially increased following the launch of Nestlé's Cocoa Plan. SAC ¶¶ 12–14, 32, 35. Nestlé claims UTZ farms (who are alleged to participate in a child labor monitoring program) have fewer instances of child labor on them, when in fact they actually have more reported child labor on their farms than non-UTZ farms. *Id.* at ¶ 45. Nestlé admits that, at best, only 25% of its cocoa is traceable. *See id.* at ¶ 54. Of the cocoa that is claimed to be from traceable farming cooperatives, only 22 of 70 cooperatives even have Nestlé's purported monitoring system in place, and those that do still report that 22 percent of their labor comes from children. *Id.* at ¶¶ 37, 40–42. Nestlé admits that, at best, it "aspires" to end child slavery. *E.g.*, MTD at *9. Even an alleged "aspiration" to end child slavery is deceptive here. In spite of its "aspiration," Nestlé's product labels ***unequivocally*** claim its cocoa is "sustainably sourced" in a manner that "improves the lives of farmers" and is certified by UTZ or the Nestlé Cocoa Plan.

To address Nestlé's misrepresentations, on behalf of a nationwide class (SAC ¶¶ 94–103), Walker brings claims for violation of California's Consumers Legal Remedies Act, Cal. Civ. Code § 1750 *et seq.* ("CLRA") (SAC ¶¶ 104–16), and violation of the unlawful, fraudulent, and unfair prongs of California's Unfair Competition Law, Cal. Bus. & Prof. Code § 17200 *et seq.* ("UCL") (SAC ¶¶ 117–35). She seeks class-wide monetary and injunctive relief. SAC pp. 37–38.

## III.  LEGAL STANDARD

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must plead "enough facts to state a claim to relief that is plausible on its face," *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007), that is, enough

1   facts to "raise a right to relief above the speculative level, on the assumption that all

2   the allegations in the complaint are true," *id.* at 555. On a 12(b)(6) motion, "[a]ll

3   allegations of material fact in the complaint are taken as true and construed in the

4   light most favorable to Plaintiffs." *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007,

5   1016 (9th Cir. 2020).

6   **IV.   ARGUMENT**

7        **A.   Plaintiff's Claims are Based on Affirmative Misrepresentations,**

8        **not Pure Omissions**

9        Nestlé cites a number of decisions in support of the proposition that it has "no

10   affirmative obligation to *disclose* potential supply chain challenges." MTD at *6–8

11   (emphasis added). All of its purported authority is unavailing however because all

12   its cases address pure omissions claims. Plaintiff does not seek to have Nestlé

13   disclose anything.  To the contrary, Nestlé has voluntarily made the statements at

14   issue on its product labels of its own volition "for the purpose of promoting or

15   securing sales of the products to potential buyers." Order Denying Defendant's

16   Special Motion to Strike ("Anti-SLAPP Order) (Dkt. 31) at p. 5.  This is why there

17   is a different standard for a misrepresentation claim – no one forced Nestlé to make

18   the marketing statements it made.  Plaintiff does not bring any omissions claims and,

19   instead, asserts claims based on Nestlé's affirmative misrepresentations on its labels.

20        *Hodsdon v. Mars, Inc.*, 891 F.3d 857 (9th Cir. 2018) (*see* MTD at *6–7), is

21   wholly inapposite because there, unlike here, the plaintiff "[did] not allege any

22   affirmative misstatement and [relied] solely on an *omission* theory of consumer

23   fraud." *Hodsdon*, 891 F.3d at 861 (emphasis added). *Hodsdon* has no bearing here,

24   where all of Walker's claims focus on affirmative statements, not pure omissions.

25   *McCoy v. Nestlé USA, Inc.*, 173 F. Supp. 3d 954 (N.D. Cal. 2016), and *Dana v.*

26   *Hershey Co.*, 180 F. Supp. 3d 652 (N.D. Cal. 2016), are off point for the same reason.

27   *McCoy*, 173 F. Supp. 3d at 956; *Dana*, 180 F. Supp. 3d at 654.

28

1    Nestlé's other citations also all suffer from the same flaw: they all involve
2    pure omissions claims, while Walker's case is based on affirmative
3    misrepresentations. *Tomasella v. Nestlé USA, Inc.*, 962 F.3d 60, 65 (1st Cir. 2020)
4    ("Before us . . . is the very narrow question of whether Defendants' failure to include
5    on the packing of their chocolate products information regarding upstream labor
6    abuses in their cocoa bean supply chains constitutes an unfair or deceptive business
7    practice within the meaning of [Massachusetts' consumer protection statute]."); 
8    *Wirth v. Mars Inc.*, No. 15-cv-01470-DOC-KES, 2016 WL 471234, at *1 (C.D. Cal.
9    Feb. 5, 2016) (claim was based on omissions and duty to disclose); *Barber v. Nestlé
10   USA, Inc.*, 154 F. Supp. 3d 954, 957, 962 (C.D. Cal. 2015) (same)[6]; *see also Hughes
11   v. Big Heart Pet Brands*, No. 15-cv-08007-CJC-AGR, 2016 WL 524057, at *1 (C.D.
12   Cal. Jan. 15, 2016) (dismissed for same reasons as *Barber*); *Rosa v. Tri-Union
13   Seafoods, LLC*, No. 15-cv-07540-CJC-AGR, 2016 WL 524059, at *1 (C.D. Cal. Jan.
14   15, 2016) (same). The Court should easily reject Nestlé's first argument.

15       **B.    The SAC Plausibly Alleges False and Misleading Statements**

16       Claims under the UCL and CLRA are governed by the "reasonable consumer"
17   standard, under which Plaintiff must "show that 'members of the public are likely to
18   be deceived.'" *Williams v. Gerber Prods. Co.*, 552 F.3d 934, 938 (9th Cir. 2008).
19   "[T]he reasonable consumer standard requires a probability 'that a significant
20   portion of the general consuming public or of targeted consumers, acting reasonably
21   in the circumstances, could be misled.'" *Moore*, 966 F.3d at 1017. California's
22   consumer protection statutes "prohibit 'not only advertising which is false, but also
23   advertising which[,] *although true*, is either actually misleading or which has a
24   capacity, likelihood or tendency to deceive or confuse the public.'" *Id.*

25   _____

26   [6] *Barber* does also address certain claimed misrepresentations later in the opinion,
     but that involved misrepresentations on Nestlé's website, which is inapplicable here.
27   *See* Anti-SLAPP Order at pp. 6-8.

28

1
2

### 1. Nestlé's Cocoa Plan is not Helping Improve the Lives of Farmers – the Statement is False and Misleading

3    Nestlé first argues that, while Plaintiff claims the Nestlé Cocoa Plan name or
4    logo misleads consumers into thinking Nestlé's product is child labor and slave-
5    labor free, "neither the Nestlé Cocoa Plan logo nor any statements about it make any
6    explicit or implicit reference to labor practices at all." MTD at *9. Nestlé proceeds
7    to argue that the language on the product packaging "does not suggest (or even
8    imply) that the labor challenges in West Africa have been solved; to the contrary, it
9    reflects that there is more work to be done, and that Nestlé USA aspires for and is
10   working towards improvement." *Id.*   Nestlé conveniently and self-servingly
11   reframes the issue and the Court should reject these arguments. As discussed above,
12   the statement that the Nestlé Cocoa Plan is helping "improve the lives of farmers" is
13   false and deceptive.   Conditions on Nestlé's farms have gotten worse since it
14   instituted its Cocoa Plan.  See SAC at ¶¶ 13, 14, 17, 35, 37, 45, 49.

15   Additionally, the SAC plausibly alleges that the Nestlé Cocoa Plan
16   representations, viewed in context on the product labeling, ***do*** imply to the
17   reasonable consumer that ***the products*** are free from child labor and slave labor and
18   that buying the products will benefit farmers in Côte D'Ivoire . *E.g.*, SAC ¶¶ 34–36.
19   Critically, these implications stand in glaring contrast to the reality that "Nestlé's
20   profiteering off child labor does not help the lives of farmers," *id.* at ¶ 35; that
21   "[c]hild labor has undisputedly increased in Côte d'Ivoire since Nestlé instituted its
22   'Cocoa Plan,'" *id.*; that "Nestlé has yet to commit to paying farmers a fair price for
23   their cocoa and does not currently have any long-term plans to support farmers
24   achieving a living income," *id.*; that independent monitoring has confirmed "the
25   continued presence of child labor on Nestlé Cocoa Plan CLMRS-certified farms,"
26   *id.* at ¶ 35; that "[c]hild labor constituted 21% of the labor on CLMRS farms," *id.*;
27   and that the Nestlé Cocoa Plan "does not even try to certify that children are not
28   being used as forced labor," *id.* at ¶ 38. Stating that the Nestlé Cocoa Plan "help[s]

improve" the lives of cocoa farmers is misleading when the reality is the vast majority of the cocoa *in the products at issue* comes from farms at which child slave labor is commonplace, *id.* at ¶¶ 41–42, 48–50, 52–56, and as Nestlé itself admits, after the launch of the Cocoa Plan, child labor and slave labor have increased, *id.* at ¶¶ 12–14, 32, 35. *Moore*, 966 F.3d at 1017 (California consumer protection law prohibits advertising that is technically true yet misleading).

Nestlé claims that the "Nestlé Cocoa Plan" statement is "aspirational," MTD at *9, 10, but nothing in the text or context of the statement suggests that it is equivocal. To the contrary, Nestlé states in no uncertain terms that, through the Nestlé Cocoa Plan, its products affirmatively "[s]upport[] farmers" and "help improve" their lives. SAC ¶¶ 19–20. These implications are false and misleading. Furthermore, even assuming the "Nestlé Cocoa Plan" claims were aspirational (which they are not), they would still be actionable because they contribute to the overall deceptiveness of the label, *Hadley*, 273 F. Supp. 3d at 1085, 1089, and because California courts reject the argument that "aspirational statements are immune from liability under the false advertising laws," *L.A. Taxi Coop., Inc. v. Uber Techs., Inc.*, 114 F. Supp. 3d 852, 860 (N.D. Cal. 2015) (explaining that there is no authority in support of Uber's proposition that adding phrases such as "Uber is committed to . . . ," "Uber works hard to . . . ," or "We're doing everything we can to . . . " to an advertising statement automatically shields a defendant from liability).

*Barber v. Nestlé USA, Inc.*, 154 F. Supp. 3d 954 (C.D. Cal. 2015), which Nestlé cites, is not on point. *See* MTD at *10. In *Barber*, the plaintiff challenged statements Nestlé made in four separate online documents discussing its corporate business principles and its rules for its suppliers. *Barber*, 154 F. Supp. 3d at 962–63. The court held that the full context of the documents showed that Nestlé "seems to anticipate a certain level of non-compliance" with its rules for its suppliers because, for example, one document stated that Nestlé "ask[s] [its] suppliers and their sub-tier suppliers" to comply with its rules and that the "standards of the Code set forth

expectations" for suppliers. *Id.* at 963, 964. By contrast, the representations at issue here appear on product labels, not in longer online documents, and Nestlé points to no similar indication that its labeling claims are not affirmative assertions.

Next, Nestlé argues that Plaintiff "cherry picks" her source for the claim that Nestlé's Cocoa Plan has made things worse for farmers, not better. MTD at *11. Ironically, it is Nestlé that cherry picks its own data. Nestlé never disputes that the widespread incidence of child labor on its own Cocoa Plan farms has ***continued to increase since it created the plan***. Because it can't. Plaintiff more than adequately alleged that the Nestlé Cocoa Plan has not only failed to improve the lives of farmers, but rather has made the situation worse. *E.g.*, SAC at ¶¶s 13, 14, 17, 35, 37, 45, 49 (alleging child labor has increased in Côte d'Ivoire since Nestlé instituted its Cocoa Plan). At best, Nestlé's assertions regarding whether it is in fact helping farmers merely serve to highlight hotly disputed issues of fact not appropriate for resolution at the motion to dismiss stage. *See Reilly v. Chipotle Mexican Grill, Inc.*, No. 15-cv-23425, 2016 WL 10644065, at *4 (S.D. Fla. Apr. 20, 2016) ("The divergence in the parties' positions only indicates that, at this point, more evidence is needed . . . .").

Nestlé's reliance on *Ehlers v. Ben & Jerry's Homemade Inc.*, No. 2:19-cv-00194, 2020 WL 2218858 (D. Vt. May 7, 2020) (*see* MTD at *11), is misplaced because in *Ehlers*, the plaintiff "[based] his claim on a representation that [was] neither contained on [the defendant's] ice cream cartons nor on its website." *Ehlers*, 2020 WL 2218858, at *6. Here, by contrast, the SAC includes pictures of the full representations at issue in context on the product labels, SAC ¶¶ 19–20, and Nestlé has not explained how the SAC's analysis of the statements at issue fails to account for the full text and context of the statements in any material way.

### 2.   Nestlé's "Certified Through UTZ" Representations and Seals are False and Misleading

Nestlé argues that its "UTZ certified" representations and seals are not deceptive because Walker's "subjective desire for the UTZ program to have higher

standards, or more dramatic results, does not make Nestlé USA's statements about its UTZ certification false or misleading." MTD at *12–13.  As discussed above, Nestlé misses the mark.  Plaintiff claims the certification itself is a sham.  *E.g.* SAC ¶¶ 44-47.  Plaintiff cites Nestlé and UTZ's own study which exposed that there is **widespread use of child labor on UTZ certified farms**, children are doing prohibited hazardous or unhealthy work on UTZ certified farms, and there are worse conditions on UTZ certified farms than non-UTZ certified farms.[7]  Nestlé knows UTZ certified farms have a higher rate of child labor than non-certified farms and that use of the UTZ seal is false and misleading when it slaps it on its labels.

Plaintiff also challenges the UTZ certified claims and seals because they falsely and misleadingly imply the products have been sustainably, ethically sourced, and have not been created through the use of child labor—not merely because the UTZ program does not meet Plaintiff's subjective desires. *See* SAC ¶¶ 2, 17–18, 44, 47. Indeed, the SAC alleges the "UTZ certified" claims and seals "purportedly stand for ethical and sustainable farming, including better working conditions and better care for the natural environment." *Id.* at ¶ 18. She further alleges these assurances are false because, among other reasons, a 2018 study "found widespread use of child labor on UTZ certified farms and a lack of oversight on those farms." *Id.* at ¶ 45. On this Rule 12(b)(6) motion to dismiss, the Court should accept these allegations as true and construe them in the light most favorable to Plaintiff. *Moore*, 966 F.3d at 1016.

Nestlé also argues that the UTZ certification represents that some of its products and programs are certified by UTZ, which Plaintiff does not dispute. MTD at *13. As stated above, however, California's consumer protection statutes "prohibit 'not only advertising which is false, but also advertising which[,] *although true*, is either actually misleading or which has a capacity, likelihood or tendency to

---

[7] *See* SAC at ¶¶ 44-47.

deceive or confuse the public.'" *Moore*, 966 F.3d at 1017. In other words, even assuming, *arguendo*, that the "UTZ certified" statement is not wholly inaccurate, that would not immunize Nestlé from liability for deceiving the reasonable consumer into believing the products are sustainably, ethically sourced without the use of child labor when that is not the case. Moreover, Nestlé's position is a myopic and incomplete assessment of the implied meaning of UTZ certification as alleged in the SAC. The SAC alleges, for example, that UTZ "claims child labor is prohibited on its certified farms." SAC ¶ 44. The Court should not determine as a matter of law at the motion to dismiss stage that, contrary to Plaintiff's plausible allegations, the UTZ certification does not imply to reasonable consumers that the products have been sustainably and ethically sourced and have not been created using child labor.

### 3. Nestle's "Sustainably Sourced" Representations are False and Misleading

Nestlé argues that the SAC's allegations regarding Nestlé's "sustainably sourced" claim "are not tethered to the actual text and content of the statement." MTD at *13. Nestlé states that the full representation on the morsels packages pictured in the SAC is "Sustainably Sourced Through Nestlé Cocoa Plan Certified Through UTZ," and on the hot cocoa package pictured in the SAC, the "sustainably sourced" reference "appears on the same back panel that carries the Nestlé Cocoa Plan logo and the description of its mission." *Id.*

To the extent Nestlé is arguing that Plaintiff has ignored the full context of the "sustainably sourced" statement, this argument is baseless because the SAC reveals the full context and content of all representations at issue, SAC ¶¶ 17–20, and the representations viewed together are just as likely to deceive a reasonable consumer as their constituent parts. *See also id.* at ¶ 44 (recognizing Nestlé couples its "Nestlé Cocoa Plan" logo with a reference to UTZ certification). Even assuming Walker had ignored the full statement, the full statement is just as deceptive as each of its constituent parts, including "Sustainably Sourced," "Nestlé Cocoa Plan," and

1 "Certified Through UTZ," for all of the same reasons that the constituent parts are

2 deceptive. *See* SAC ¶¶ 25–30, 32, 37, 40, 45, 48–48, 55–56, 59, 69, 78, 88–91.

3 Stringing the words together does nothing to ameliorate their deceptiveness.

4      Nestlé argues that reasonable consumers understand the term "sustainably

5 sourced' in context to refer to the Nestlé Cocoa Plan and UTZ "sourcing initiatives,"

6 which are described on the product labels. MTD at *13–14. The Court should reject

7 Defendant's argument. As Plaintiff alleges, the phrase "sustainable" has a powerful

8 (and exceedingly profitable) meaning in marketing. Products claiming to be

9 produced through socially and environmentally responsible practices are favored by

10 consumers. SAC ¶ 24. Nestlé has been keen to exploit that meaning. *See* SAC ¶¶

11 22, 67. A reasonable consumer interprets statements such as "sustainably sourced"

12 as meaning those products were produced with superior environmental and socially

13 responsible standards in place. This is particularly so when such statements are

14 flanked with seals like the UTZ certification and the Nestlé Cocoa Plan. In *Koh v.*

15 *S.C. Johnson & Son, Inc.*, No. 09-cv-00927-RMW, 2010 WL 94265 (N.D. Cal. Jan.

16 6, 2010), the court found it plausible that a product label containing an

17 "environmental seal," such as a globe icon with the text "Earth Smart" around it,

18 was "likely to convey to consumers that the product is environmentally superior to

19 other products" and would be deceptive "[i]f the manufacturer cannot substantiate

20 this broad claim." *Koh*, 2010 WL 94265, at *2. By putting "sustainability" claims

21 on its products, Nestlé clearly intended to convey to consumers that the products are

22 environmentally and ethically sustainable. *See*, Anti-SLAPP Order at 5.

23      Critically, the pertinent question does not concern the objective meaning of

24 "sustainable," but rather whether a reasonable consumer, such as Plaintiff, would

25 hold Nestlé's "sustainability" claims to higher environmental and social standards

26 than forced child labor and environmental destruction. *Ham v. Hain Celestial Grp.*

27 *Inc.*, 70 F. Supp. 3d 1188, 1193 (N.D. Cal. 2014) (explaining that "the question is

28 not whether [the plaintiff] provides a plausible definition of 'All Natural,' but

1   whether a reasonable consumer would expect to find [a synthetic ingredient] in

2   Waffles that are labeled 'All Natural'"). Walker has more than sufficiently alleged

3   that a reasonable consumer would understand Nestlé's "sustainability" claims in just

4   such a fashion. That is all that is required at this stage of the proceedings.

5          Indeed, equating "sustainability" with slave labor is abhorrent. As the SAC

6   alleges, "***[n]o companies, including Nestlé, can claim to be sourcing sustainable***

7   ***cocoa***, as nearly Nestlé's totality of cocoa sourced in the country comes from farms

8   in which no auditing, monitoring, awareness training, remediation mechanisms or

9   environmental-friendly practices are set up by the industry." SAC ¶ 53 (emphasis

10  added). Nestlé's use of the words "sustainably sourced" as a marketing ploy is

11  particularly misleading because a reasonable consumer does not know that Nestlé

12  actively exploits forced child labor, stymies change, and purposefully perpetuates a

13  system built on child slavery to depress labor costs. *Doe I v. Nestlé USA, Inc.*, 766

14  F.3d 1013, 1024–27 (9th Cir. 2014). Nestlé's own materials confirm that even it

15  associates "sustainability" with child labor. *E.g.*, website at SAC ¶ 1 n.2 (noting

16  "cornerstone" of "sustainability" is ending child labor); website at SAC ¶ 1 n.1

17  ("[S]ustainable cocoa sourcing must include a robust approach to tackling the

18  problem of child labor."). Similarly, the irreconcilability of "sustainability" with

19  widespread environmental destruction is clear. Whatever definition is used, a

20  reasonable consumer would not consider "sustainable" and "sustainably sourced"

21  products "[s]upporting farmers" to mean that Nestlé is actively and purposefully

22  furthering child slave labor and contributing to massive and widespread

23  deforestation and environmental destruction.

24         Citing *Kwan v. SanMedica International*, 854 F.3d 1088 (9th Cir. 2017),

25  Nestlé suggests Walker is bringing a lack of substantiation claim. MTD at *14.

26  Plaintiff, however, does not merely allege Defendant cannot show its challenged

27  representations are truthful. Rather, Plaintiff alleges she has *evidence* she will use to

28  prove Defendant's labeling statements are deceptive, as discussed above. *E.g.*, SAC

1  ¶¶ 12–14, 32, 35, 37, 40–42, 45, 48–50, 52–56, 83–84, 86. Consequently, *Kwan* is

2  inapposite. In a factually similar deceptive labeling case involving statements

3  Starbucks makes on its hot cocoa products, claiming its cocoa is "ethically sourced",

4  the court found the defendant's reading of *Kwan* to have missed the mark:

> *Kwan* does not save Starbucks from a false advertising claim entirely;
> rather, *Kwan* merely places the burden of proof on [Plaintiff]. *Kwan*
> held that "private plaintiffs, unlike prosecuting authorities, do not have
> the power to require defendants to substantiate their advertising claims,
> and that private plaintiffs, like prosecuting authorities, have the burden
> of proving that the markets claims are false or misleading.

9  *Myers v. Starbucks Corp.*, No. 5:20-cv-00335-JWH-SHK, 2021 WL 1921120,

10  at *5–6 (C.D. Cal. May 5, 2021).

11      Nestlé's reliance on the July 29, 2020, opinion in *Myers v. Starbucks Corp.*,

12  *see* MTD at *10, is misleading because Plaintiff in that case was granted leave to

13  amend. On the next motion to dismiss, the court in *Myers* **denied** defendant

14  Starbucks Corp.'s second motion to dismiss where its labels used the phrase

15  "ethically sourced," which is materially identical to the "sustainably sourced" claim

16  before this Court. *Myers v. Starbucks Corp.*, No. 5:20-cv-00335-JWH-SHK, 2021

17  WL 1921120, at *5–6 (C.D. Cal. May 5, 2021). This Court should follow the May

18  5, 2021, opinion in *Myers* regarding the claims against Starbucks and decline to

19  dismiss Plaintiff's complaint.

20      Grasping at straws, Nestlé cherry picks a paragraph out of the FTC's

21  "Proposed Revisions to [the Green] Guidelines" and claims that the FTC determined

22  "sustainable" is not a "general environmental claim" because reasonable consumers

23  do not understand the term "sustainable" to refer to the environment. MTD at *15.

24  What Nestlé self-servingly leaves out is the FTC warns that when sustainability is:

25  "used ***in combination with environmental terms and images***, consumers may

26  perceive 'sustainable' as an environmental claim." Guides for the Use of

27  Environmental Marketing Claims, 75 Fed. Reg. 63,552, 63,583 (Oct. 15,

28  2010)(emphasis added). Such is the case here. Thus, some of these commenters

1 recommended that the Guides caution that the term "sustainable" be accompanied

2 by language limiting its environmental superiority claim to the particular attribute,

3 or attributes, that can be substantiated. *Id.* at 63,581. Some commentators argued

4 that the FTC should prohibit use of the term "sustainable" as a marketing claim

5 altogether. *Id.* The FTC concludes: In the end, it is clear that "sustainability" claims

6 must be evaluated on a "case-by-case basis" – which is why the FTC said "the issue

7 is not appropriate for *general* guidance." *Id.* at 63,583. The FTC did not in any way

8 say that a reasonable consumer would not be deceived by the use of the term

9 "sustainable"; rather, the opposite.

10       A similar argument to Nestlé's was rejected in *Jou v. Kimberly-Clark Corp.*:

11       Nor is "natural" mere puffery because the Federal Trade Commission
         ("FTC") has declined to provide "general guidance" on the use of that
12       term . . . Indeed, far from deeming "natural" mere non-actionable
         puffery, the FTC statement goes on to explicitly warn marketers that
13       the use of "natural" may be deceptive: Marketers that are using terms
         such as natural must ensure that they can substantiate whatever claims
14       they are conveying to reasonable consumers. *If reasonable consumers
         could interpret a natural claim as representing that a product contains
15       no artificial ingredients, then the marketer must be able to substantiate
         that fact.* Similarly, if, in a given context, a natural claim is perceived
16       by reasonable consumers as a general environmental benefit claim or
         as a comparative claim (e.g., that the product is superior to a product
17       with synthetic ingredients), then the marketer must be able to
         substantiate that claim and all attendant reasonably implied claims.

18 *Jou v. Kimberly-Clark Corp.*, No. 13-cv-03075-JSC, 2013 WL 6491158, at *8 (N.D.

19 Cal. Dec. 10, 2013). At most, Defendant's quotes from the FTC Green Guides point

20 to factual disputes that cannot be decided at this juncture.

21       Finally, Defendant argues that even if the SAC adequately tied "sustainably

22 sourced" to the environment, the statement would not be misleading because

23 Defendant has committed to help improve the environment, including through an

24 "Action Plan" aimed at preventing deforestation and promoting reforestation. MTD

25 at *15-16. At best, this argument points to factual disputes as to the meaning of

26 "sustainably sourced" in context that the Court should not resolve as a matter of law

27 on a motion to dismiss. *Williams*, 552 F.3d at 938–39.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.   Whether A Reasonable Consumer Would be Deceived Is a Factual Issue Not Appropriately Decided on a Motion to Dismiss

As set forth above, claims under the UCL and CLRA are governed by the "reasonable consumer test." *Williams*, 552 F.3d at 938. The CLRA at California Civil Code section 1760 also emphasizes that "[the law] shall be liberally construed and applied to promote its underlying purposes, which are to protect consumers against unfair and deceptive business practices and to provide efficient and economical procedures to secure such protection." CAL. CIV. CODE § 1760. It is well-settled that when evaluating deceptiveness, context is crucial. *See, e.g., Sandoval v. PharmaCare US, Inc.*, 730 Fed. App'x 417, 419 (9th Cir. 2018) (unpublished); *Williams*, 552 F. 3d at 939 n. 3. It is additionally well-settled in California courts that "whether a business practice is deceptive is an issue of fact not generally appropriate for decision on a motion to dismiss." *Maisel v. S.C. Johnson & Son, Inc.*, 2021 WL 1788397 at *8 (N.D. Cal. May 5, 2021) (citing *Williams*, 552 F.3d at 938-939). Indeed, "it is a 'rare situation in which granting a motion to dismiss is appropriate'" because these situations "'raise[] questions of fact.'" *Stewart v. Kodiak Cakes, LLC*, 2021 WL 1698695 at *18 (S.D. Cal. Apr. 29, 2021) (internal citations omitted). Whether consumers could be misled is ordinarily a question of fact and a decision to dismiss based solely on a court's own review of a package is generally improper. *Williams*, at 938–39 (9th Cir. 2008). It is a "rare situation" in which dismissal of these claims would be appropriate because the allegations could not meet the "reasonable consumer" test. *Id*. at 939. This is not one of those "rare situations." This is one where it is probable that a significant portion of the public would be misled by the statements on Defendant's packaging.

### 1.   Defendant's Statement that its Cocoa is "Sustainably Sourced" Would Deceive a Reasonable Consumer

"The marketing industry is based on the premise that labels matter, that consumers will choose one product over another similar product based on its label."

*Kwikset Corp. v. Superior Court*, 51 Cal. 4th 310, 328 (2011). The phrase "sustainable" has a powerful meaning in marketing. Products claiming to be produced through socially and environmentally responsible practices are favored by consumers.[8] In an analysis of different industries, chocolate products' growth was the most pronounced based on claims of sustainability, with such products growing at more than 3 times the rate of chocolate products without sustainability claims. SAC ¶ 24. Nestlé has been keen to exploit this commonly understood meaning to capture the booming market for sustainable products enjoyed by some of its competitors without making the same substantive commitments.

A reasonable consumer interprets statements such as "sustainably sourced" as meaning those products were produced with superior environmental and socially responsible standards in place. By putting statements like "sustainably sourced" on its labels, Nestlé could only expect to be conveying representations that the product was sustainable environmentally and ethically to socially conscious consumers. *Brown v. Hain Celestial Group, Inc.*, 913 F. Supp. 2d 881 (N.D. Cal. 2012), is instructive. In *Brown*, the plaintiffs asserted the defendant's cosmetic product brand name, which included the word "organic," and its "pure, natural, and organic" tagline were misleading or false. *Brown*, 913 F. Supp. 2 at 898. The court found such statements could deceive a reasonable consumer into believing the cosmetics were predominantly made from organic ingredients. *Id*. As in *Brown*, Nestlé's "sustainably sourced" claim is likely to deceive a reasonable consumer into believing that all, if not most, of the cocoa in its product is harvested through particular environmental and social protocols, when in fact, it is not. SAC ¶ 3. A reasonable consumer would not read these statements and understand that the products were made by child labor, let alone the "worst forms" of child labor.

---

[8] See, e.g., Inc.com, 73 Percent of Millennials are Willing to Spend More Money on this 1 Type of Product, https://www.inc.com/melanie-curtin/73-percent-of-millennials-are-willing-to-spend-more-money-on-this-1-type-of-product.html.

1 Furthermore, "[f]or a significant segment of the buying public, labor practices

2 do matter in making consumer choices." *Kwikset Corp.*, 51 Cal. 4th at 329 (quoting

3 *Kasky v. Nike, Inc.*, 27 Cal. 4th 939, 969 (2002)). The California Supreme Court

4 explained: "To some consumers, processes and places of origin matter." *Id.*

5 Purchasing decisions may be "heavily influenced" by information regarding the

6 manner in which goods are produced, such as whether food is kosher or halal,

7 whether wine is from a particular locale, whether a diamond is conflict-free, and

8 whether food was produced by union workers, although these considerations have

9 nothing to do with the product's function or performance:

> Whether a particular food is kosher or halal may be of enormous consequence to an observant Jew or Muslim. Whether a wine is from a particular locale may matter to the oenophile who values subtle regional differences. Whether a diamond is conflict free may matter to the fiancée who wishes not to think of supporting bloodshed and human rights violations each time she looks at the ring on her finger. And whether food was harvested or a product manufactured by union workers may matter to still others.

15 *Id.* at 328–29.

16 For consumers who rely on the truth and accuracy of a label and are deceived

17 by misrepresentations into making a purchase, the economic harm is the same: the

18 consumer has purchased a product that they paid more for than they otherwise might

19 have been willing to pay if the product had been labeled accurately. The economic

20 harm—the loss of real dollars from a consumer's pocket—is the same whether or

21 not a court might objectively view the products as functionally equivalent. *Id.* at 329.

22 Nestlé's cases are not on point or helpful here. *Becerra v. Dr. Pepper/Seven*

23 *Up Inc.*, 945 F.3d 1225 (9th Cir. 2019), involved the word "diet" in Diet Dr. Pepper

24 and whether it means weight loss. *Painter v. Blue Diamond Growers*, 757 F. App'x

25 517 (9th Cir. 2018) (unpublished), involved the use of the name "Almond Milk"

26 instead of "imitation milk." *Ebner v. Fresh, Inc.*, 838 F.3d 958 (9th Cir. 2016),

27 involved the disclosures on a lip treatment tube when the consumer could see and

28 access the actual product inside. Here, the misstatements do not involve the name of

the product nor the physical characteristics of the product itself but, rather, a statement regarding the sourcing of the product. Defendant's other cases are also inapposite. *Cheslow v. Ghiradelli Chocolate Co.*, 445 F. Supp. 3d 8, 17 (N.D. Cal. 2020); *Lam v. Gen. Mills, Inc.*, 859 F. Supp. 2d 1097, 1104 (N.D. Cal. 2012); *Figy v. Frito-Lay N. Am., Inc.*, 67 F. Supp. 3d 1075, 1091 (N.D. Cal. 2014); and *Maxwell v. Unilever U.S., Inc.*, No. 12-cv-1736, 2018 WL 1536761, at *4 (N.D. Cal. Mar. 29, 2018), all involved a plaintiff unreasonably believing that a word on the label meant the product contained certain ingredients. Here, Plaintiff challenges the characteristics of the cocoa contained in the product, not whether there actually is cocoa. *Rubenstein v. The Gap, Inc.*, 14 Cal. App. 5th 870, 878 (2017), is also inapposite, as there the plaintiff did not allege that any statement misrepresented the quality of the clothes. Here, Defendant has stated its cocoa is "sustainably sourced."

### 2. Nestlé's Statement that It Helps "Improve the Lives of the Cocoa Farmers and the Quality of Their Products" Would Deceive a Reasonable Consumer

Nestlé argues that the statement claiming that it helps "improve the lives of the cocoa farmers and the quality of their products" is true. However, even if the statement is true, it can still be actionable if it has the capacity, likelihood, or tendency to deceive or confuse the public. *Bailey v. Rite Aid Corporation*, 2019 WL 4260394 at *6 (N.D. Cal Sept. 9, 2019). This statement is misleading as it implies to that the product comes from sustainable farming practices when it does not. SAC ¶ 83. Nestlé also asserts that this statement is merely aspirational. However, courts reject the argument that aspirational statements are immune from liability under the false advertising laws. *L.A. Taxi Coop., Inc.*, 114 F. Supp. 3d at 862.

As further discussed above, Defendant's citation to *Barber v. Nestlé USA Inc.* is misplaced. -- *Barber* does not involve misrepresentations on labels as Defendant asserts. In *Barber*, the plaintiff brought claims under the UCL, CLRA, and False Advertising Law, urging that Nestlé had an affirmative duty to disclose on its cat

1   food product labels that it is likely produced with forced labor. The court held that

2   Defendant had no affirmative duty to disclose and the California Supply Chain

3   Transparency Act ("CSCTA") created a safe harbor. *Barber*, 154 F. Supp. 3d at 958.

4   The plaintiff also asserted that statements made on Defendant's website were

5   misleading. This case, unlike *Barber*, does not involve the CSCTA, does not

6   challenge website statements, and does not assert an affirmative duty to disclose –

7   rather, the exact opposite: here, Defendant has affirmatively, of its own volition, put

8   statements on its labels that are deceptive and false. Contrary to Defendant's self-

9   serving statement, the principle that there is no duty to disclose, as set forth in

10  *Barber*, does not control the outcome here.

11
12
### 3. Defendant's Use of UTZ on its Labels Would Deceive a Reasonable Consumer

13  In context, a reasonable consumer would interpret the statement "Certified

14  through UTZ" to mean that the product contains sustainable ethically sourced cocoa.

15  SAC ¶ 47. Plaintiff has alleged that UTZ is a sham and that the farms it certifies still

16  use child labor. *See, e.g.*, SAC ¶¶ 45–46. Through use of the UTZ name, Nestlé

17  misleadingly represents that its product is held to a higher standard, when the UTZ

18  seal does not have a meaningful impact and is a "business-friendly" certification. In

19  *Water & Sanitation Health, Inc. v. Rainforest Alliance, Inc.*, the plaintiff alleged that

20  Rainforest Alliance certification induced the plaintiff to spend money that they

21  would not have had they been aware that the Rainforest Alliance seal did not in fact

22  stand for what it purports to. The court found this allegation sufficient to state a

23  claim. No. C15-75RAJ, 2015 WL 12657110, at *5 (W.D. Wash. Dec. 29, 2015). The

24  same conclusion applies here. Plaintiff has alleged that the statements on the label,

25  that the cocoa is sustainably sourced, taken together with the seal on the packaging,

26  represented a certain ethical standard.

27  A seal and accompanying statement can in fact mislead a consumer. Contrary

28  to Defendant's assertions, *Hill v. Roll International Corp.* actually supports

1 | Plaintiff's position. In *Hill*, the image on the product was a simple green drop
2 | alongside a URL directing consumers to a company website. 195 Cal. App. 4th 1295,
3 | 1299 (2011). The court relied upon the fact that the symbol did not resemble any
4 | third-party certification in finding that no reasonable consumer would think that the
5 | symbol made any specific representation. *Id*. at 1304. *Hill* does stand for the
6 | principle that a statement can be true but still be actionable because it has the
7 | "capacity, likelihood, or tendency to deceive or confuse the public." *See also Bailey*,
8 | 2019 WL 4260394, at *6. As alleged in the complaint, even allegedly certified beans
9 | are made with forced labor. SAC ¶ 45.

10 | ### D.    The Law Does Not Require a Consumer to go to a Website

11 | The reasonable consumer test does not require consumers to "look beyond
12 | misleading representations on the front of the box to discover the truth from the
13 | ingredient list in small print on the side of the box." *Williams*, 552 F.3d at 939–40.
14 | A reasonable consumer is not expected to go to the Nestlé Cocoa Plan website to
15 | test the veracity of the statements made on the product packaging. As in *Williams*,
16 | there should be no expectation that Plaintiff do further research to assess Nestlé's
17 | assertion, even on the same label. *E.g., Coe v. Gen. Mills, Inc.*, No. 15-cv-05112-
18 | TEH, 2016 WL 4208287, at *5 (N.D. Cal. Aug. 10, 2016) (less prominent, smaller
19 | font statements on front of box were insufficient to dispel deception created by more
20 | prominent, larger font statement on front of box). That is why "[a] manufacturer
21 | cannot cure a misleading statement on a product label by simply providing a further
22 | explanation of the statement on the manufacturer's website." *Fernandez v. Atkins
23 | Nutritionals, Inc.*, 2018 WL 280028, at *8 n.6 (S.D. Cal. Jan. 3, 2018). This is
24 | particularly true for the front label statement on Nestlé's Toll House Semi-Sweet
25 | Morsels, which states that the product has been "Sustainably Sourced Through
26 | Nestlé Cocoa Plan" and "Certified Through UTZ" without pointing to a website.

27 | As this Court found in denying Defendant's Special Motion to Strike:
28 | Even if the website contained sufficient information to dispel the allegedly

---

deceptive message on the product labels, an issue as to which the Court expresses no opinion, this would not undermine Plaintiff's claims. "We disagree with the district court that reasonable consumers should be expected to look beyond misleading representations on the front of the box to discover the truth from the ingredient list in small print on the side of the box."

ECF No. 31, at *6 (internal citations omitted).

Defendant's citation to *Brown v. Starbucks Corp.*, No. 18-cv-2286, 2019 WL 996399 (S.D. Cal. Mar. 1, 2019), is inapposite. In *Brown*, the court found there was no bait-and-switch problem between the front and back label because there was no deceptive statement on the front label. *Brown*, 2019 WL 996399, at *4. Here, Defendant's statements on the front label are deceptive.

Defendant proceeds to argue that its labels are "ambiguous." That is not the case here, and Defendant asks the Court to apply an incorrect legal standard. Nestlé's labels are deceptive and mislead the consumer into thinking that the products were produced outside of the social and environmental conditions that afflict much of Côte d'Ivoire. Even assuming the "ambiguity" standard were the correct one (which it is not), these facts are not like those of Defendant's cited cases, where the labels were ambiguous and an ingredient list clarified the ambiguous statement. *See Workman v. Plum Inc.*, 141 F. Supp. 3d 1032, 1035 (N.D. Cal. 2015) ("[A]ny potential ambiguity could be resolved by the back panel of the products, which listed all ingredients in order of predominance, as required by the FDA."). Here, Defendant unequivocally claims that its cocoa is sustainably sourced, a statement that cannot be refuted by an ingredient list. Finally, the reasonable consumer test does not ask whether labeling is "ambiguous," but, rather, whether the labeling is likely to deceive a reasonable consumer, *Williams*, 552 F.3d at 938–40; *accord Moore*, 966 F.3d at 1017; the Court should follow *Williams* and *Moore*, and not decisions imposing an "ambiguity" standard, which conflicts with the reasonable consumer standard as set out in *Williams*. *Robinson v. Unilever United States, Inc.*, No. 17-cv-03010-DMG-AJW, 2019 WL 2067941, at *3 (C.D. Cal. Mar. 25, 2019) (holding

1    that the court was bound to follow *Williams* and applying *Williams*' articulation of
2    the reasonable consumer standard under California law).

3        Nestlé nevertheless contends, relying solely on *three unpublished cases*, that
4    a defendant can insulate itself from liability for misleading statements on its
5    packaging by including somewhere on the label a reference to a website which, if
6    the consumer visits before purchasing, allegedly cures the misrepresentation. Mem.
7    20–22. Nestlé's contention is contradictory to the Ninth Circuit's reasoning in
8    *Williams*. Moreover, Defendant's cases are distinguishable. In *Swearingen v.*
9    *Healthy Beverage, LLC*, No. 13-cv-04385-EMC, 2017 WL 1650552, at *4 (N.D.
10   Cal. May 2, 2017), the plaintiff *did* read a website which disabused her of a possible
11   misrepresentation on the label. *Id*. Here, Plaintiff did not read it prior to purchasing
12   the products. In *Nowrouzi v. Maker's Mark Distillery, Inc.*, 2015 WL 4523551 (S.D.
13   Cal. July 27, 2015), the district court found that the statement on the product itself,
14   in a very different factual context, could not have caused a reasonable consumer to
15   believe what the plaintiff contended. *Id*. at *7–8. Reasonable consumers could easily
16   believe from Nestlé's labeling that its cocoa was not sourced from farms using child
17   slavery and causing widespread environmental destruction. In *Myers-Taylor v.*
18   *Ornua Foods North America, Inc.*, 2019 WL 424703, at *4 (S.D. Cal. Feb. 4, 2019),
19   the district court dismissed a claim that the website itself misled a plaintiff through
20   a particular statement, given the same page expressly disabused her of the otherwise
21   misleading representation. The case in no way suggested that websites immunize
22   manufacturers from misleading packaging, and indeed expressly contrasted the
23   packaging, which at "no point" had the relevant misleading statement. *Id*. A
24   consumer is not required to look to a different part of the same box, let alone search
25   through an extensive website with numerous pages while in a supermarket to
26   disabuse herself of misrepresentations. *Williams*, 552 F.3d at 939-940.

27       Defendant tries to deflect by touting its compliance with the California
28   Transparency Supply Chains Act. This is a red herring. Plaintiff is not challenging

1  the information posted on the website. Even if Nestlé complies with the Act by

2  putting the required information on its website, that does not immunize Nestlé for

3  putting false labeling on its products.

4  **E.    Plaintiff has Established Article III Standing to Challenge the**

5  **Labeling of Products she did not Purchase.**

6  Plaintiff has pleaded sufficient facts to establish standing to challenge the

7  labeling of, and represent a class who purchased, products that she did not purchase.

8  A plaintiff has standing to bring claims for unpurchased products where "the

9  products and alleged misrepresentations are substantially similar." *Brown* at 890.

10 Article III standing has been found for unpurchased products where the alleged

11 misrepresentations were identical across different product lines and the common

12 misrepresentations were the crux of the plaintiff's case. *Id*. at 892. In this case, where

13 the various labels across multiple product lines all boldly state that the cocoa is

14 sustainably sourced, the Nestlé Cocoa Plan and UTZ certifications are also touted

15 on all those various product labels to suggest that Nestlé products are sustainably

16 sourced, and where the crux of the action is the misleading nature of these assertions,

17 Plaintiff has Article III standing for the unpurchased products as well.

18 Defendant's reliance on *Wilson v. Frito-Lay N. Am., Inc*., 961 F. Supp. 2d

19 1134 (N.D. Cal. 2013) is misplaced. Standing is proper on these facts because the

20 alleged misrepresentations were shared across product lines and form the crux of

21 this case. Additionally, as Defendant surely knows, the very next sentence of the

22 holding in *Wilson* they rely upon (*Wilson* at 1140-41) explains that one way to

23 determine whether products are 'substantially similar' is to determine "whether they

24 are comprised of largely the same ingredients." *Id*. In *Astiana v. Dreyer's Grand Ice*

25 *Cream, Inc.*, No. C 11–2910 EMC, 2012 WL 2990766, at *11 (N.D.Cal. July 20,

26 2012), the court found that the plaintiff had standing for the unpurchased products

27 because "many of the ingredients are the same." *Id*. at *13. In *Wilson*, the complaint

28 was held to be insufficiently pled, because it claimed "eighty–five Non–Purchased

Products" were "'substantially similar' to the five Purchased Products" without explaining what particularly was actionable about the allegedly misleading packaging. *Wilson* at 1141. In this case, where the unpurchased products contain many of the same ingredients, including the ingredient that forms the factual basis of this action, it is clear the unpurchased products are "substantially similar" for purposes of Article III, a standard which Defendant agrees is a low bar. MTD at 21.

Defendant's other authority, *Ehlers v. Ben & Jerry's Homemade Inc.*, 2020 WL 2218858 at *6 (D. Vt. May 7, 2020), is equally misplaced. In that case, "Plaintiff base[d] his claim on a representation that is neither contained on [Defendant's] ice cream cartons nor on its website. *Id.* at *6. By contrast, in this case the statements at issue are in fact featured prominently on the labels of many of Defendant's products. In order to establish standing, "it is Plaintiff's burden to plausibly allege that the [packaging of Defendant's product] or website contains a statement that "conveys more than one meaning to reasonable consumers and one of those meanings is false[.]" *Id.* (quoting *Lofts Essex, LLC v. Strategis Floor and Décor Inc.*, 224 A.3d 116, 127 (Vt. 2019)). As shown in the preceding sections, the statements found on Defendant's packaging could be found misleading by a reasonable consumer.

Finally, Defendant's statements about the sale of some of its products is a red herring and clearly meant to confuse the issues. The class period extends back to April 2015, long before Defendant sold off some of its products. For all the foregoing reasons, Plaintiff has Article III standing even for products that were not purchased by Plaintiff herself.

## V.    CONCLUSION

For the foregoing reasons, the Court should deny Nestlé's motion to dismiss in full. If the Court grants any part of the motion, Walker respectfully requests leave to amend. *Foman v. Davis*, 371 U.S. 178, 182 (1962); FED. R. CIV. P. 15(a)(2).

1  Date: June 7, 2021                                Respectfully submitted,

2                                                    **SCHONBRUN SEPLOW HARRIS**
                                                     **HOFFMAN & ZELDES, LLP**
3
                                                By: _/s/ Helen I. Zeldes_
4                                                    Helen I. Zeldes, Esq. (SBN 220051)
                                                     *hzeldes@sshhzlaw.com*
5                                                    Ben Travis (SBN 305641)
                                                     *btravis@sshhzlaw.com*
6                                                    501 West Broadway, Suite 800
                                                     San Diego, California 92101
7                                                    Telephone: (619) 400-4990

8                                                    **SCHONBRUN SEPLOW HARRIS**
                                                     **HOFFMAN & ZELDES, LLP**
9                                                    Paul L. Hoffman (SBN 71244)
                                                     *hoffpaul@aol.com*
10                                                   John C. Washington (SBN 315991)
                                                     *jwashington@sshhzlaw.com*
11                                                   200 Pier Avenue, Suite 226
                                                     Hermosa Beach, California 90254
12                                                   Telephone: (310) 396-0731

13                                                   **SCHONBRUN SEPLOW HARRIS**
                                                     **HOFFMAN & ZELDES, LLP**
14                                                   Catherine Sweetser (SBN 271142)
                                                     *catherine.sdshhh@gmail.com*
15                                                   9415 Culver Boulevard # 115
                                                     Culver City, California 90232
16                                                   Telephone: (310) 396-0731

17                                                   **REESE LLP**
                                                     Michael R. Reese (SBN 206773)
18                                                   *mreese@reesellp.com*
                                                     100 West 93rd Street, 16th Floor
19                                                   New York, New York 10025
                                                     Telephone: (212) 643-0500
20                                                   Facsimile: (212) 253-4272

21                                                   **REESE LLP**
                                                     George V. Granade (SBN 316050)
22                                                   *ggranade@reesellp.com*
                                                     8484 Wilshire Boulevard, Suite 515
23                                                   Los Angeles, California 90211
                                                     Telephone: (310) 393-0070
24                                                   Facsimile: (212) 253-4272

25                                                   *Counsel for Plaintiff Renee Walker*
                                                     *and the Proposed Class.*
26

27

28