1   THEODORE J. BOUTROUS, JR., SBN 132099
     tboutrous@gibsondunn.com
2   CHRISTOPHER CHORBA, SBN 216692
     cchorba@gibsondunn.com
3   PERLETTE JURA, SBN 242332
     pjura@gibsondunn.com
4   TIMOTHY W. LOOSE, SBN 241037
     tloose@gibsondunn.com
5   GIBSON, DUNN & CRUTCHER LLP
   333 South Grand Avenue
6   Los Angeles, CA 90071
   Telephone:  213.229.7000
7   Facsimile:  213.229.7520

8   *Counsel for Defendant Nestlé USA, Inc.*

9

10

11              UNITED STATES DISTRICT COURT

12           SOUTHERN DISTRICT OF CALIFORNIA

13   MARIE FALCONE,            CASE NO. 3:19-cv-00723-L-DEB

14          Plaintiff,     **DEFENDANT NESTLÉ USA, INC.'S**

15                 **OPPOSITION TO PLAINTIFF'S**
         v.              **MOTION FOR CLASS**

16                 **CERTIFICATION**
   NESTLÉ USA, INC., a Delaware
17   Corporation; and DOES 1 TO 100,   *No hearing will be held unless requested*
                     *by the Court.  ECF No. 131.*

18         Defendants.
                     *30-page brief permitted by the Court.*
19                   *ECF No. 121.*

20

21              **REDACTED - PUBLIC VERSION**

22

23

24

25

26

27

28

---

# TABLE OF CONTENTS

Page

I. INTRODUCTION ........................................................................................... 1

II. STATEMENT OF FACTS ............................................................................ 2

    A.    The Motion Challenges 59 Different Nestlé USA Product Labels ........... 2

    B.    Nestlé USA's Label-Design Process and Studies ................................... 5

    C.    The Nestlé Cocoa Plan ........................................................................... 6

    D.    Plaintiff Marie Falcone's Deposition ...................................................... 7

III. LEGAL STANDARD .................................................................................. 9

IV. ARGUMENT ............................................................................................ 10

    A.    Falcone Cannot Serve as Class Representative. ................................... 10

        1.    Falcone does not have statutory standing to seek any form of relief. .................................................................................... 10

        2.    Falcone is not "typical" of the proposed class. ............................ 12

    B.    There Is No Evidence of Classwide Deception. .................................. 14

        1.    The proposed class was not exposed to the same labels, and many class members never saw the challenged representations at all. ................................................................. 16

        2.    Consumers do not have a "common" understanding of the labels. ........................................................................................... 19

        3.    There is no evidence of classwide materiality or reliance. ........... 21

        4.    There is no way to identify purportedly injured class members. ..................................................................................... 24

    C.    There Is No Evidence of Damages. ...................................................... 25

        1.    There is no common evidence of classwide damages. ................... 26

        2.    A "full refund" damages methodology is unsupportable. ............. 27

    D.    Falcone Cannot Certify a Rule 23(b)(2) Class Seeking Injunctive Relief. ................................................................................................... 28

V. CONCLUSION .......................................................................................... 28

# TABLE OF AUTHORITIES

Page(s)

## Cases

*Algarin v. Maybelline, LLC*,
  300 F.R.D. 444 (S.D. Cal. 2014) .................................................. 16, 24, 25

*Allen v. Hyland's Inc.*,
  300 F.R.D. 643 (C.D. Cal. 2014) ....................................................... 27

*Allen v. Similasan Corp.*,
  306 F.R.D. 635 (S.D. Cal. 2015) ....................................................... 27

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) ....................................................................... 16

*In re Asacol Antitrust Litig.*,
  907 F.3d 42 (1st Cir. 2018) .............................................................. 24

*Astiana v. Kashi Co.*,
  291 F.R.D. 493 (S.D. Cal. 2013) ................................................... 20, 21

*Backus v. ConAgra Foods, Inc.*,
  2016 WL 7406505 (N.D. Cal. Dec. 22, 2016) ...................................... 13

*Bell v. Publix Super Markets, Inc.*,
  982 F.3d 468 (7th Cir. 2020) ........................................................... 17

*Cabral v. Supple LLC*,
  608 F. App'x 482 (9th Cir. 2015) ...................................................... 16

*Capaci v. Sports Rsch. Corp.*,
  2022 WL 1133818 (C.D. Cal. Apr. 14, 2022) ...................................... 27

*In re Clorox Consumer Litig.*,
  301 F.R.D. 436 (N.D. Cal. 2014) ...................................................... 19

*Comcast Corp. v. Behrend*,
  569 U.S. 27 (2013) .......................................................... 1, 10, 12, 25, 28

*Corcoran v. CVS Health*,
  2017 WL 1065135 (N.D. Cal. Mar. 21, 2017) ...................................... 12

*Davidson v. Kimberly-Clark Corp.*,
  889 F.3d 956 (9th Cir. 2018) ........................................................... 28

*Ellis v. Costco Wholesale Corp.*,
  657 F.3d 970 (9th Cir. 2011) ........................................................... 12

*Gonzalez v. Proctor & Gamble Co.*,
  247 F.R.D. 616 (S.D. Cal. 2007) ...................................................... 24

*Hadley v. Kellogg Sales Co.*,
  324 F. Supp. 3d 1084 (N.D. Cal. 2018) .............................................. 18

ii

*Hanon v. Dataproducts Corp.*,
  976 F.2d 497 (9th Cir. 1992) .............................................................. 12, 13

*Hinojos v. Kohl's Corp.*,
  718 F.3d 1098 (9th Cir. 2013) ................................................................. 10

*Johns v. Bayer Corp.*,
  2010 WL 476688 (S.D. Cal. Feb. 9, 2010) ............................................... 14

*Jones v. ConAgra Foods, Inc.*,
  2014 WL 2702726 (N.D. Cal. June 13, 2014) ........................ 10, 11, 12, 20

*Korolshteyn v. Costco Wholesale Corp.*,
  2017 WL 1020391 (S.D. Cal. Mar. 16, 2017) ............................................ 27

*Lambert v. Nutraceutical Corp.*,
  870 F.3d 1170 (9th Cir. 2017) ................................................................. 27

*Lara v. First Nat'l Ins. Co. of Am.*,
  25 F.4th 1134 (9th Cir. 2022) ................................................................. 24

*Lierboe v. State Farm Mut. Auto. Ins. Co.*,
  350 F.3d 1018 (9th Cir. 2003) ........................................................... 10, 12

*Major v. Ocean Spray Cranberries, Inc.*,
  2013 WL 2558125 (N.D. Cal. June 10, 2013) ........................................... 14

*Mazza v. Am. Honda Motor Co.*,
  666 F.3d 581 (9th Cir. 2012) ............................................................ 16, 19

*McGinity v. Procter & Gamble Co.*,
  69 F.4th 1093 (9th Cir. 2023) ................................................................. 22

*Mezzadri v. Med. Depot, Inc.*,
  2016 WL 5107163 (S.D. Cal. May 12, 2016) ............................................ 16

*Moheb v. Nutramax Lab'ys Inc.*,
  2012 WL 6951904 (C.D. Cal. Sept. 4, 2012) ............................................ 25

*Moore v. Mars Petcare US, Inc.*,
  966 F.3d 1007 (9th Cir. 2020) ................................................................. 17

*Moreno v. AutoZone, Inc.*,
  410 F. App'x 24 (9th Cir. 2010) .............................................................. 12

*NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*,
  926 F.3d 528 (9th Cir. 2019) ................................................................... 10

*In re NJOY, Inc. Consumer Class Action Litig.*,
  120 F. Supp. 3d 1050 (C.D. Cal. 2015) .................................................... 19

*Nunez v. Saks Inc.*,
  2017 WL 1184058 (S.D. Cal. Mar. 22, 2017) ........................................... 14

*Ogden v. Bumble Bee Foods, LLC*,
  292 F.R.D. 620 (N.D. Cal. 2013) ............................................................. 14

*Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*,
  31 F.4th 651 (9th Cir. 2022) .................................................................10, 14, 16, 24, 26

*Pierce-Nunes v. Toshiba Am. Info. Sys.*,
  2016 WL 5920345 (C.D. Cal. June 23, 2016) .........................................................17

*Pulaski & Middleman, LLC v. Google, Inc.*,
  802 F.3d 979 (9th Cir. 2015) .................................................................................26

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
  934 F.3d 619 (D.C. Cir. 2019) ...............................................................................25

*Silva v. B&G Foods, Inc.*,
  2022 WL 4596615 (N.D. Cal. Aug. 26, 2022) .........................................................26

*Spacone v. Sanford, L.P.*,
  2018 WL 4139057 (C.D. Cal. Aug. 9, 2018) ............................................................13

*Stearns v. Ticketmaster Corp.*,
  655 F.3d 1013 (9th Cir. 2011) ..........................................................................12, 21

*Turcios v. Carma Lab'ys, Inc.*,
  296 F.R.D. 638 (C.D. Cal. 2014) ........................................................................10, 11

*Van v. LLR, Inc.*,
  61 F.4th 1053 (9th Cir. 2023) .................................................................................25

*Vizcarra v. Unilever United States, Inc.*,
  339 F.R.D. 530 (N.D. Cal. 2021) ......................................................................17, 20

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011).................................................................................................9

*Walker v. Life Ins. Co. of the Sw.*,
  953 F.3d 624 (9th Cir. 2020) .....................................................................18, 19, 24

*Yeager v. Bowlin*,
  693 F.3d 1076 (9th Cir. 2012) ...............................................................................12

## Other Authorities

https://www.beslaveryfree.com/chocolate.........................................................................7

https://www.nestlecocoaplan.com/reports .......................................................................6

## Rules

Fed. R. Civ. P. 23 ...................................................................................................*passim*

# I.  INTRODUCTION

Plaintiff Marie Falcone's motion asks this Court to certify a class based on a theory that 59 different product labels saying different things are all misleading in the same way.  The motion claims that consumers all saw various small, mostly back-of-label representations about the Nestlé Cocoa Plan as promising the end of all risks of child labor in West Africa, and further asserts that these representations were the *only* reason consumers bought Nestlé USA's chocolate.  There are several problems with this theory.  The main one is that Falcone herself does not even believe it.

Falcone repeatedly testified at her deposition that she has "no problems" with the labels her counsel challenges and *was not sure whether she would have joined the case* if she knew that is what the current product labels looked like.  Declaration of T. Loose ("Loose"), Ex. 2, 214:2–219:25.  Further, after reviewing the Nestlé Cocoa Plan reports, Falcone agreed the program is "putting their money where their mouth is" and "is delivering" the progress she wants to see.  *Id.* 241:15–242:7, 245:13–20.  Falcone cannot certify a class alleging deception given that she herself was not deceived.

Nor does Plaintiff's counsel's theory survive scrutiny as to other putative class members.  Both internal Nestlé USA surveys and expert evidence shows that consumers: (1) were not exposed to the same representations on the 59 different labels at issue; (2) did not interpret those representations as having anything to with child labor; and (3) did not find any of the challenged statements material in their buying decisions.  The motion does not offer any expert analysis to rebut these conclusions.  Instead, it just asks the Court to presume that class certification is proper, on nothing more than an assurance that counsel will figure it out later.  That empty promise cannot withstand the "rigorous analysis" required by Rule 23.  *Comcast Corp. v. Behrend*, 569 U.S. 27, 33 (2013).

The flaws in the motion come into even sharper focus as one moves from liability to damages.  Plaintiffs in false advertising cases are required to offer a classwide methodology that shows the purported difference in value between the advertised product and what actually was delivered.  Falcone's motion skips that step entirely.

DEFENDANT'S OPPOSITION TO PLAINTIFF'S MOTION FOR CLASS CERTIFICATION          CASE NO. 19CV723

Without *any* supporting evidence it claims that all consumers think Nestlé USA's products are entirely "worthless."  But the same cases the motion relies upon make clear that this theory does not work in cases involving food and beverages.  Moreover, Falcone's own testimony—along with extensive survey evidence—confirms that there were *no* damages here.  Many consumers did not even see the small, back-of-label statements Falcone challenges.  Those who did see the statements did not interpret them in the way the motion suggests, nor ascribe any value to them in making their purchases.  And Falcone cannot escape these problems by asking for an injunctive-relief class because she does not have standing to seek that relief herself.

Much of Falcone's motion is preoccupied with technical allegations about things like traceability in Nestlé USA's supply chain.  But for any of that to matter in this false-advertising case, Falcone must first show that she and other consumers uniformly saw the representations she challenges, interpreted them as making promises about the supply chain, and relied on those supposed promises when making purchases.  Because Falcone cannot make that showing, the Court should not certify a class.

## II.  STATEMENT OF FACTS[1]

### A.   The Motion Challenges 59 Different Nestlé USA Product Labels

This is a case about the labels on products within three longstanding Nestlé USA brands:  Nestlé Toll House, Nestlé hot cocoa mix, and Nesquik.  The Nestlé Toll House brand has been a household staple since 1939 and is by far the most popular brand of chocolate chips in the U.S.  *See* Expert Report of Dr. Ran Kivetz ("Kivetz"), ¶ 215 Fig. 23.  Nestlé hot cocoa mix boasts an even longer history, having been sold for over 100 years.  *See* Dkt. 125-2, Ex. 3.  Even Nesquik, the newest of these three brands, has been sold in the U.S. for 75 years.  Loose, Ex. 1.  As Falcone testified, Nestlé has become a beloved brand because its products "really taste better."  *Id.*, Ex. 2 108:16–18.

---

[1] Given space limitations, Nestlé USA cannot feasibly address each of the many factual misstatements in Falcone's motion which have no bearing on class certification.  Nestlé USA does not concede these alleged facts and is confident that, if the Court looks at the full statements from which the motion cherry-picks, it will see how little substance there is to those allegations.

Falcone's motion challenges a total of 59 labels, which span seven different products:  Toll House semisweet morsels, Toll House mini morsels, Toll House dark chocolate morsels, Toll House milk chocolate morsels, mini marshmallows hot cocoa, rich milk chocolate hot cocoa, and Nesquik powder.  *See* Dkt. 125-2, Exs. 3–5.  A chart attached as Appendix A demonstrates the wide variety of labels and statements at issue.

When the 59 labels are put side-by-side, it is obvious that there is no uniform set of representations, much less common representations that speak to labor conditions in the cocoa supply chain.  Take the front of the labels.  Most (36 of 59) of the labels have *no front-of-package representations* relating to the Nestlé Cocoa Plan, cocoa sourcing, or sustainability at all.  Fifteen of the labels feature only a small square emblem that says "Nestlé Cocoa Plan," with no other accompanying words or text:






Dkt. 125-2, Ex. 4 at 4, 39; Ex. 5 at 3; Ex. 3 at 2.

For one product only—a 4.5 pound, jumbo-sized semisweet morsels bag that Falcone never bought, Loose, Ex. 2 110:25–111:16—some (but not all) versions of the

3

label say "Sustainably Sourced Through Nestlé Cocoa Plan" on the front in small text:



Dkt. 125-2, Ex. 4 at 10.  No other product featured "sustainably" on the front label.

There is even more variation on the back of the packages.  Some of the labels have a small blurb on the back or side of the package that says:  "Supporting farmers for better chocolate.  The Nestlé Cocoa Plan works to help improve the lives of cocoa farmers and the quality of their products.  www.nestlecocoaplan.com"—usually in small font:

 

Dkt. 125-2, Ex. 5 at 7, Ex. 4 at 39.  Other labels instead have a back-of-package snippet that says:  "Responsibly Sourced Cocoa through the Nestlé Cocoa Plan":



Dkt. 125-2, Ex. 4 at 4.  Finally, a few of the hot cocoa labels and the Nesquik labels reference on the back of the package "sustainably-sourced" or "sustainably harvested" cocoa beans:

 

Dkt. 125-2, Ex. 3 at 2; Ex 5 at 13.

The packages also vary in their reference to third-party certifiers like UTZ and Rainforest Alliance.  Eleven labels have a Rainforest Alliance logo.  *See* Dkt. 125-2, Ex. 3 at 8–9, 30, 37–38, 44, 55, 68; Ex. 4 at 5, 17–20, 25.  Another 24 labels have an UTZ logo.  *E.g.*, *id.* Ex. 4 at 6, 8.  The remaining 24 labels do not feature either logo.

In addition to differences in written representations, there is substantial variation in the design and layout of the 59 labels Falcone challenges.  In short, almost nothing ties all 59 of these labels together other than the fact that they say "Nestlé" somewhere.

**B.   Nestlé USA's Label-Design Process and Studies**

Nestlé USA worked with design agencies when creating the product labels at issue in this case and, as a part of that process, conducted surveys of prospective customers to inform its design choices.  Loose, Ex. 3, 132:25–133:5, 195:5–6, 198:3–12.  The results of all of these surveys pointed in the same direction: ████████████████████████

███████████████████████████████████████████████████

████████████████████████████████████

Multiple internal surveys confirmed that ████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

███████████████████████████████████████████████████

1   ██████████████████████████████████████████████████████

2   ███████████████████████████████████████████

3   **C.      The Nestlé Cocoa Plan**

4          In 2009, Nestlé S.A. (Nestlé USA's ultimate Swiss parent company) launched the

5   Nestlé Cocoa Plan, which seeks to improve conditions in cocoa-farming communities.

6   The Nestlé Cocoa Plan has three pillars on which it focuses its activities:

7          1.  *Better Farming*:  Providing training and resources to help cocoa farmers increase

8              their yields and adopt good practices for cocoa farming.

9          2.  *Better Lives*:   Improving social conditions by monitoring and supporting

10             remediation of child labor risks, promoting women's empowerment to improve

11             gender equality and household revenues, and enabling access to quality education.

12         3.  *Better Cocoa*:  Building long-term relationships with farmer groups, continuing

13             to develop certification and verification, and promoting forest-positive actions.

14  *See generally* Loose, Ex. 9.  The Nestlé Cocoa Plan publishes regular reports detailing

15  progress in each category.  *See* https://www.nestlecocoaplan.com/reports.  As described

16  in those reports, the Cocoa Plan has devoted over 224 million Swiss Francs (over $250

17  million U.S. dollars) to these efforts since 2009.  *See* Loose, Ex. 10 at 7.

18         While Nestlé S.A. administers the Nestlé Cocoa Plan, Nestlé USA's role is limited

19  to that of a customer, or buyer, of cocoa through that program.  ███████████████████

20  ██████████████████████████████████████████████████████████████████████████

21  ██████████████████████████████████████████████████████████████████████

22  ████████████████████████████████████████████ Nestlé USA began using

23  the Nestlé Cocoa Plan logo on certain products beginning in 2015.  Dkt. 125-2, Ex. 2.

24         Falcone's motion focuses on two areas in which the Nestlé Cocoa Plan seeks to

25  improve conditions:  combatting child labor and deforestation.  *See* Mem. 1.  The Nestlé

26  Cocoa Plan has acknowledged the gravity of these systemic issues and has devoted

27  considerable money and effort to impacting conditions in both areas.

28         The Nestlé Cocoa Plan takes a multi-prong approach to reduce the risk of child

labor in cocoa-farming communities, including by building schools, providing school supplies, and monitoring farms to address child-labor risks. *See* Loose, Ex. 9 at 6, 10. Through these programs, the Nestlé Cocoa Plan has provided support to more than 170,000 children. *Id.* The Cocoa Plan also introduced an "income accelerator program" that incentivizes parents to enroll their children in school by providing direct payments to families based on school enrollment. *See* Loose, Ex. 11 at 2–4.

The Nestlé Cocoa Plan takes a similarly robust approach to deforestation threats, including by funding patrols for existing rainforests, educating farmers on agroforestry practices, and re-planting native trees to help regenerate forests. *See* Loose, Ex. 12.

Outside observers have lauded the Nestlé Cocoa Plan's efforts. For instance, Be Slavery Free—an independent research and advocacy group—publishes a "Chocolate Scorecard" that ranks Nestlé as one of the *top two* companies in the world addressing child and forced labor issues, and one of the *top four* companies addressing deforestation risks in the cocoa supply chain. *See* https://www.beslaveryfree.com/chocolate.

## D. Plaintiff Marie Falcone's Deposition

This case was initially filed on behalf of Renee Walker. Dkt. 1. After Walker voluntarily dismissed her claims, her counsel stayed involved in this case and solicited a new plaintiff to take Walker's place: Marie Falcone. Dkt. 77.

Falcone "love[s] Nestlé" and has been buying Nestlé USA products for decades, long before the Nestlé Cocoa Plan existed. Loose, Ex. 2, 28:25–29:4, 33:1–3, 165:2–7, 189:9–17. She became involved in this case only after Plaintiff's counsel called Falcone in response to a comment she made on the Top Class Actions website and convinced her to sign on as a plaintiff. *Id.* 30:25–32:7. A limited visit to the Cocoa Plan website, along with a skim of the complaint, constituted the full extent to which counsel educated Falcone about their allegations. *Id.* 35:2–12. Falcone was not shown the full Cocoa Plan website, nor did she read the webpages described in the complaint, *id.* 179:25–180:10, despite her allegations otherwise, *see* Dkt. 78 ¶ 80.

This cursory presentation left Falcone with an inaccurate impression of the facts

underlying this case.  She believed that the Nestlé Cocoa Plan had not issued a report since 2019, even though reports had been published every year since that time.  Loose, Ex. 2 46:15–47:11, 150:14–18.  Likewise, Falcone was unaware of public information discussing the Cocoa Plan's extensive efforts and expenditures exceeding $250 million. *Id.* 237:19–245:17.  Nor did she know what the current labels on Nestlé USA's morsels looked like, instead basing her understanding on pictures of older versions of the product labels taken by someone else.  *Id.* 214:19–215:10, 218:9–219:11.

Based on these misunderstandings, Falcone agreed to serve as a plaintiff in this case.  Her purpose for doing so was to encourage an "update" of the 2019 Cocoa Plan report, Loose, Ex. 2, 46:15–47:11, and to move representations about the Cocoa Plan to "the back" of the labels, *id.* 197:21–198:2, 202:14–16, 203:8–12, 208:24–209:3, 214:24–215:2.  Falcone also wanted to see the Cocoa Plan make "little steps" toward improving conditions on cocoa farms in West Africa.  *Id.* 43:9–13.  Those "changes" already happened many years ago, and they are "all [Falcone] want[s] to see happen" through this case.  *Id.* 89:1.

During Falcone's deposition, the vast disconnect between her experience and her counsel's allegations was revealed.  For example, Falcone testified that Nestlé USA's labels are "not misleading anyone."  Loose, Ex. 2, 197:4–8.  When Falcone was shown versions of Toll House morsels labels using a design that has been on store shelves since before this case was filed in 2019, she called them "beautiful" and "perfect."  *Id.* 214:2–217:25.  She further testified to having "no problems" with those labels, and told Nestlé USA's representative at the deposition:  "put them for sale, and I'm going to go buy them."  *Id.* 216:2–8.  Falcone also stated that she was not sure whether she would have joined the case if she knew Nestlé USA was already using the current product labels, because the issues she was concerned about have already been "remedied" by those labels.  Loose, Ex. 2 219:20–25, 245:21–246:3.

Falcone also disagreed with her lawyers' interpretation of Nestlé USA's labels. She "never once thought of child slave labor" when she saw the labels.  Loose, Ex. 2

95:10–17.  Instead, she understood the phrase "sustainably sourced" as referring to the environment.  *Id.* 95:13–14, 144:20–22.  Similarly, Falcone expressly disagreed with her counsel's claim that "[n]o companies . . . can claim to be sourcing sustainable cocoa," Dkt. 78 ¶ 53, testifying instead that she thinks companies can claim to have sustainably sourced cocoa so long as they do "due diligence" and "follow the guidelines" put forward by the Rainforest Alliance.  Loose, Ex. 2 178:23–179:23, 158:2–9.

Falcone testified several times that she was satisfied with everything Nestlé USA and the Nestlé Cocoa Plan are doing.  She said she would "absolutely" buy Nestlé USA products if more Nestlé Cocoa Plan reports were published after 2019—which they have been.  Loose, Ex. 2 46:15–47:11, 150:14–16, 238:16–20, 246:13–17.  And once Falcone was shown the public Nestlé Cocoa Plan updates, she agreed the program is "putting their money where their mouth is," and "is delivering" on the statements made on product labels.  *Id.* 241:15–242:7, 245:13–20.  Falcone also thought the $250 million-plus that the Cocoa Plan has spent is "a lot," "especially in [a] country" like Côte d'Ivoire or Ghana.  *Id.* 241:15–242:4.

Finally, Falcone testified multiple times that she would be willing to drop her claims and go back to buying Nestlé USA products if the Nestlé Cocoa Plan "follow[ed] the rules and the guidelines" from the Rainforest Alliance, if the Cocoa Plan published reports, and if Nestlé USA used labels that do not display the Cocoa Plan logo on the front of the packages she buys.  *E.g.*, Loose, Ex. 2 87:4–22, 120:2–13, 122:8–14, 43:11–13, 44:4–20.  There is no dispute that Nestlé USA and the Nestlé Cocoa Plan have done all of this since before the case was filed.  *See* Loose, Ex. 15 (certifications from Rainforest Alliance); Ex. 13 220:20–221:11.  Nevertheless, instead of dropping Falcone's claims, Plaintiff's counsel now seek to use her as the figurehead for a class.

## III.  LEGAL STANDARD

A class action is "an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only."  *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 348 (2011).  Plaintiffs wishing "to proceed through a class action must actually

*prove*—not simply plead—that their proposed class satisfies each requirement of Rule 23." *Olean Wholesale Grocery Coop., Inc. v. Bumble Bee Foods LLC*, 31 F.4th 651, 664 (9th Cir. 2022) (en banc). Courts must undertake a "rigorous analysis" to ensure that the party seeking certification has met its burden, *Comcast*, 569 U.S. at 33, which plaintiffs may satisfy only with "admissible evidence," *Olean*, 31 F.4th at 665.

## IV. ARGUMENT

### A. Falcone Cannot Serve as Class Representative.

#### 1. Falcone does not have statutory standing to seek any form of relief.

A class cannot "be certified if the class representative lack[s] standing as to [her] individual claim." *NEI Contracting & Eng'g, Inc. v. Hanson Aggregates Pac. Sw., Inc.*, 926 F.3d 528, 533 (9th Cir. 2019). Indeed, if an "individual plaintiff lacks standing, the court need never reach the class action issue" at all, and the case should be dismissed. *Lierboe v. State Farm Mut. Auto. Ins. Co.*, 350 F.3d 1018, 1022–23 (9th Cir. 2003).

To establish standing for the CLRA and UCL claims Falcone raises, a plaintiff must show she was deceived by the defendant and, as a result, lost money or property. *See Hinojos v. Kohl's Corp.*, 718 F.3d 1098, 1108 (9th Cir. 2013). Once past the pleadings stage, a plaintiff's claim of standing must be backed up by facts and testimony, rather than bare allegations. *See Turcios v. Carma Lab'ys, Inc.*, 296 F.R.D. 638, 643 (C.D. Cal. 2014) (evaluating plaintiff's testimony in determining standing); *Jones v. ConAgra Foods, Inc.*, 2014 WL 2702726, at *3–4 (N.D. Cal. June 13, 2014) (same).

Falcone does not have statutory standing because she *admits* she wasn't deceived by Nestlé USA. Plaintiff's counsel's theory of injury in this case is that consumers are deceived because they understand the statements on Nestlé USA's product labels to constitute a promise that those products are made from cocoa sourced without child labor and harmful environmental practices and that the source of the cocoa is traceable and certified, and therefore if the products are "tainted" with *any* child labor at any point in the supply chain, they "are worthless to consumers." Mem. 6, 29.

Falcone's testimony makes clear that she was not deceived under this theory. She

said she "never once thought of child slave labor" when she saw the labels her lawyers are challenging.  Loose, Ex. 2 95:15–17.  And when Falcone was shown Nestlé USA's morsels labels that have been on store shelves for years, she explained that she has "no problems" with them.  *Id.* 214:2–217:25.  Falcone concluded in her sworn deposition that Nestlé USA's labels are "not misleading anyone." *Id.* 197:4–8.

Nor does Falcone think that Nestlé USA or the Nestlé Cocoa Plan are falling short in their efforts to improve conditions in the cocoa supply chain.  Falcone testified that she thinks a company can claim to have "sustainably sourced cocoa" so long as they "follow the guidelines" put forward by Rainforest Alliance.  Loose, Ex. 2 179:5–23.  There is no dispute that Nestlé USA follows those guidelines and carries the Rainforest Alliance certification.  *Id.*, Ex. 13 220:20–221:11; Ex. 15.  And contrary to her counsel's theory that Nestlé USA has to fix all risks of child labor anywhere in its supply chain, Falcone testified that the Cocoa Plan "do[es]n't have to do a hundred percent," and that she is just looking for "little steps" toward improvement in order to be satisfied.  *Id.* Ex. 2 160:7–25; 43:9–13.  When Falcone was shown reports about the efforts the Cocoa Plan currently undertakes to improve cocoa-farming conditions, she agreed those were exactly the kind of "little steps" she wanted to see, and further agreed the Cocoa Plan "is delivering" real progress.  *Id.* 43:25–47:11, 241:15–242:7, 245:13–20.

Other courts have found that named plaintiffs lack statutory standing at the class-certification stage based on similar testimony.  For example, in *Jones*, the court determined a plaintiff lacked statutory standing to pursue UCL claims because she testified that the on-label statement her counsel was challenging was "not misleading"— the same testimony here.  2014 WL 2702726, at *4–5.  Likewise, in *Turcios*, the court concluded that plaintiff did not have statutory standing under the CLRA or UCL to challenge the volume of a lip balm container because he testified that he was satisfied with what he received.  296 F.R.D. at 643.

The record is even stronger here:  Falcone *never* thought of child labor at any point during any of her purchases.  That idea only came about after interactions with

Plaintiff's counsel about this case.  Falcone believes the current labels that have been in use since this case was filed in 2019 are "perfect."  And she thinks the Cocoa Plan is "delivering" on its aspirations.  Falcone cannot walk back these repeated and clear admissions made under oath through a sham affidavit that recites the elements of deception without addressing her prior, directly contradictory testimony.  *See* Dkt. 125-4 ¶¶ 10–12; *Yeager v. Bowlin*, 693 F.3d 1076, 1081 (9th Cir. 2012).

Falcone cannot demonstrate injury or deception based on her candid deposition testimony.  That not only means a class cannot be certified, but also that her claims should be dismissed for lack of statutory standing.  *Lierboe*, 350 F.3d at 1023.[2]

### 2.    Falcone is not "typical" of the proposed class.

Rule 23(a)(3) requires plaintiffs to show that their claims are "typical" of the class.  To satisfy this typicality requirement, a plaintiff must show that she suffered "the same or similar injury" as other class members.  *Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508 (9th Cir. 1992).  If a plaintiff's testimony shows that she "was not really deceived," then she "is not at all typical of [a] proposed class" raising deception-based claims. *Stearns v. Ticketmaster Corp.*, 655 F.3d 1013, 1019 (9th Cir. 2011), *abrogated on other grounds by Comcast*, 569 U.S. 27; *Jones*, 2014 WL 2702726, at *7 ("[G]iven Sturges's testimony that the statement she relied on was not misleading, she is not typical of a class of consumers who were allegedly misled."); *Corcoran v. CVS Health*, 2017 WL 1065135, at *8 (N.D. Cal. Mar. 21, 2017) (plaintiffs were not "typical" because their alleged injuries did not align with their lawyers' "central theory" of the case).  Nor is typicality is satisfied if the named plaintiff would be "preoccupied with defenses unique to" them.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 984 (9th Cir. 2011).

Applying these precedents, Falcone is not "typical" for at least three reasons.

*First*, even if Falcone could claim some injury, she was not injured in the same

---

[2] Plaintiff's counsel cannot substitute a new representative in these circumstances.  *See Lierboe*, 350 F.3d at 1023 (denying request to substitute a new class representative where the sole plaintiff "never had standing"); *accord, e.g.*, *Moreno v. AutoZone, Inc.*, 410 F. App'x 24, 25 (9th Cir. 2010).

way as the class she seeks to represent.  Falcone repeatedly testified to being satisfied with Nestlé USA's labels and the efforts of the Nestlé Cocoa Plan.  *See supra* at 7–9. She bought Nestlé USA chocolate because she loved the way it tasted—not because the product labels featured a rectangle smaller than a postage stamp that said "Nestlé Cocoa Plan."  *See id.*  Falcone could not have been "injured" in the way she alleges the class was if the labels did not deceive her.  At the very least, Falcone's testimony means her satisfaction with the labels and with the Cocoa Plan may become "a major focus of the litigation," which alone is enough to make her atypical.  *Hanon*, 976 F.2d at 508–09.

*Second*, Falcone will be subject to unique defenses because she is a lifelong Nestlé USA customer who was deeply committed to the brand well before it used any of the labeling her counsel now challenges.  Falcone asks to certify classes of consumers who allegedly bought Nestlé USA products *because of* the Cocoa Plan logo.  But that is not why Falcone herself bought Nestlé USA products; she testified that she bought Nestlé USA chocolate products because Nestlé USA's chocolate tastes better and because Nestlé USA products are "part of [her] DNA."  Loose, Ex. 2 51:6–14.  Falcone was buying Nestlé USA chocolate products long before the Nestlé Cocoa Plan was launched in 2009, and long before the Nestlé Cocoa Plan emblem was added to any of the at-issue products in 2015.  *Id.* 165:2–7, 189:9–14.

Other plaintiffs have been judged atypical representatives in similar situations.  In *Backus v. ConAgra Foods, Inc.*, 2016 WL 7406505 (N.D. Cal. Dec. 22, 2016), the proposed class representative was atypical in part because "he bought the products at issue for a long time before any [of the challenged] claims appeared on their labeling." *Id.* at *3.  Similarly, in *Spacone v. Sanford, L.P.*, 2018 WL 4139057 (C.D. Cal. Aug. 9, 2018), the court found that a plaintiff was atypical because he had a "materially different . . . purchasing experience" compared to the rest of the class.  *Id.* at *9.  The same is true here:  Falcone's unique purchase history and nearly lifelong devotion to Nestlé USA brands means she is not typical.

*Third*, Falcone's claims are not typical of the class because she never bought one

1   of the key products she challenges:  the 4.5 pound bag of semisweet morsels that says
2   "Sustainably Sourced Through Nestlé Cocoa Plan" on the front of the label.  Many
3   courts hold that a plaintiff does not have standing to "expand the scope of his claims to
4   include a product he did not purchase or advertisements relating to a product that he did
5   not rely upon." *Nunez v. Saks Inc.*, 2017 WL 1184058, at *5 (S.D. Cal. Mar. 22, 2017);
6   *accord, e.g.*, *Johns v. Bayer Corp.*, 2010 WL 476688, at *5 (S.D. Cal. Feb. 9, 2010).
7   Even where courts have allowed such allegations at the pleadings stage, they later have
8   held on class certification that a plaintiff cannot satisfy typicality with regard to
9   "products that she herself did not purchase"—particularly if the "claims on each of [the]
10  products may be unique to that product itself." *Major v. Ocean Spray Cranberries, Inc.*,
11  2013 WL 2558125, at *4 (N.D. Cal. June 10, 2013); *see also, e.g.*, *Ogden v. Bumble Bee*
12  *Foods, LLC*, 292 F.R.D. 620, 627 (N.D. Cal. 2013) (plaintiff could not establish
13  typicality unless other products had an "identical label claim").

14      The jumbo-sized 4.5 pound bag of morsels is the only product challenged by
15  Falcone's proposed class that featured any front-of-label claims about being
16  "sustainably sourced through the Nestlé Cocoa Plan." *See supra* at 3–4.  It also is a
17  product Falcone never bought.  Loose, Ex. 2 110:25–111:16.  Falcone did not even take
18  the pictures of that bag shown in the complaint. *Id.* 255:3–9.  She thus arguably lacked
19  a basis to raise claims related to that label in the first instance, much less can she serve
20  as a typical representative of consumers who bought that product.

21  **B.    There Is No Evidence of Classwide Deception.**

22      To justify certifying any class under Rule 23, a plaintiff must demonstrate that
23  there "are questions of law or fact common to the class."  Fed. R. Civ. P. 23(a)(3).  To
24  certify a damages class, a plaintiff must further show that those common questions
25  "predominate over any questions affecting only individual members." *Id.* 23(b)(3).  To
26  satisfy these "commonality" and "predominance" factors, a plaintiff must demonstrate
27  "that essential elements of the cause of action . . . are capable of being established
28  through a common body of evidence, applicable to the whole class." *Olean*, 31 F.4th at

666. Falcone does not and cannot make that showing here.

Falcone asks this Court to certify damages and injunctive-relief classes consisting of all California consumers who bought various Nestlé USA chocolate products from 2015 to present. Mem. 18. She argues all such persons would have thought the chocolate products "are worthless." *Id.* 29. But to arrive at that conclusion requires three leaps of logic, each of which is contradicted by the evidence in this case.

*First*, the motion asks this Court to assume that all consumers saw the same on-label "Sustainability Representations"—a term Falcone's lawyers have invented. *See* Mem. 1, 27. But there is no single uniform "representation" here; the motion challenges 59 labels that say different things, and very few labels feature the word "sustainably" at all. When "sustainably" is used, it is on the back of the package (with the one exception of the jumbo bag Falcone never bought). And overwhelming evidence shows that consumers rarely notice those back-of-label, small-font representations, making it impossible to establish uniform classwide exposure.

*Second*, the motion asks the Court to assume that all consumers would uniformly understand terms like "sustainably sourced" and "Cocoa Plan" to constitute a promise that there was no risk of child labor in Nestlé USA's supply chain. The evidence shows just the opposite: Consumers interpret terms like "sustainable" and "responsible" to mean a variety of different things, and—like Falcone herself—most consumers do not interpret Nestlé USA's labels as saying or implying anything about child labor *at all*.

*Third*, the motion asks the Court to assume that all consumers would find the back-of-label representations to be material in their decision to buy a Nestlé USA product. But the evidence shows that these specific representations are not material to consumers. Even the documents attached to the motion for class certification itself suggest that substantial numbers of consumers do not place material weight on these representations. These conclusions are confirmed by the independent surveys conducted by Dr. Ran Kivetz, the only expert to offer an opinion in the case.

Each of these facts raises individualized issues, and each provides an independent

reason why Plaintiff's counsel cannot certify any class under the commonality requirement found in Rule 23(a).  It also means that Plaintiff's counsel cannot show predominance, which "is far more demanding" than the commonality requirement and cannot be satisfied where, as here, there are "questions peculiar to the several categories of class members." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 624 (1997).

**1.    The proposed class was not exposed to the same labels, and many class members never saw the challenged representations at all.**

A court cannot certify a class in an alleged false advertising case where "it is likely that many class members were never exposed to the allegedly misleading advertisements."  *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 595 (9th Cir. 2012), *overruled on other grounds by Olean*, 31 F.4th 651.  Accordingly, a plaintiff seeking to certify a class has the burden to provide evidence that would "support a determination that all of the class members saw or otherwise received the misrepresentation." *Cabral v. Supple LLC*, 608 F. App'x 482, 483 (9th Cir. 2015); *Mezzadri v. Med. Depot, Inc.*, 2016 WL 5107163, at \*7 (S.D. Cal. May 12, 2016) (a plaintiff must "show classwide exposure to the source of the information . . . prior to purchase").  By contrast, "[c]onsumer action classes . . . have been found to be overbroad" where they "include members who were never exposed to the alleged misrepresentations at all."  *Algarin v. Maybelline, LLC*, 300 F.R.D. 444, 455 (S.D. Cal. 2014) (collecting cases).

The motion provides no evidence to suggest that class members would have seen the same representations.  Instead, it simply asserts without basis that "because Nestlé [USA] uniformly, prominently marketed the Products using the Sustainability Representations on the packaging, the Damages Class was exposed to the same deceptive course of conduct." Mem. 27.  There are three clear flaws with this argument.

**a.    There are no "uniform" representations.**

Falcone's proposed classes lump together 59 different labels that say different things in different places. *Supra* at 2–5; Appendix A.  She provides no explanation for how this Court could assume uniform exposure to these disparate labels and

representations.  She does not explain, for example, how a consumer buying a box of Nesquik powder that has a small back-of-package blurb about "supporting farmers" is being "uniformly" exposed to the same representation as a consumer who buys a bag of semisweet morsels that mentions "better cocoa" next to the Rainforest Alliance logo.

Courts regularly decline to certify classes that attempt to challenge multiple, non-uniform labels.  For example, in *Vizcarra v. Unilever United States, Inc.*, 339 F.R.D. 530 (N.D. Cal. 2021), the court reasoned that the plaintiff could not show "evidence of uniform exposure to the same allegedly misleading representations" because "there were at least 32 label variations used during the class period."  *Id.* at 545 n.4.  Similarly, *Townsend v. Monster Beverage Corp.*, 303 F. Supp. 3d 1010 (C.D. Cal. 2018), denied certification of a class involving multiple on-label representations on different products, reasoning that "the exact words matter in false advertising claims," so the plaintiff's evidence about "generic" versions of the representations was not helpful.  *Id.* at 1023–24; *see also Pierce-Nunes v. Toshiba Am. Info. Sys.*, 2016 WL 5920345, at *7 (C.D. Cal. June 23, 2016) (collecting cases holding the same).

The same is true here:  Falcone is not challenging one label or one statement. Instead, she asks the Court to certify classes challenging a whole range of representations across 59 different labels, several of which she never even purchased.  There was no "uniform" exposure here; indeed, it is hard to even determine *what* is being "uniformly" shown to consumers, as there is no single statement that Falcone identifies as uniting the supposed "Sustainability Representations."

### b.     Most consumers do not see or notice the representations.

This case deals almost exclusively with small-font, back-of-label claims.  *See supra* at 2–5.  The Ninth Circuit has explained that consumers often do not see these kinds of representations because many consumers "won't have the time or interest to read . . . the back of the box."  *Moore v. Mars Petcare US, Inc.*, 966 F.3d 1007, 1018 (9th Cir. 2020); *see also Bell v. Publix Super Markets, Inc.*, 982 F.3d 468, 476 (7th Cir. 2020) ("Many reasonable consumers do not . . . read every back label before placing

groceries in their carts."). Accordingly, courts do not infer "class-wide exposure" to claims that "only appeared on the back panel of the . . . packaging in small font." *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1100 (N.D. Cal. 2018).

Evidence confirms that this trend holds true in the context of the labels Falcone's counsel challenges. After conducting a study of consumer engagement with one of the Toll House morsels labels at issue, Dr. Kivetz concluded that "virtually *no one* indicated seeing any of the challenged claims." Kivetz ¶ 66; *see also id.* ¶¶ 64–80. Less than 1% of survey respondents could recall seeing *any* of those representations directly after viewing the label, compared with over 85% who remembered non-challenged representations from the front of the label, and 22% who remembered non-challenged representations from the back of the label. *Id.* ¶ 66, Table 1. This finding is consistent with academic literature, which shows that, for common goods like chocolate, "consumers' in-store decisions are often made quickly and without carefully reading packaging information." *Id.* ¶ 92.

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████     ████████████
████████████████████████████████████████████████████
████████████████████████ So, even among those consumers who took the time to flip over a well-known brand of chocolate chips when deciding whether to buy, the evidence shows that many did not notice the Cocoa Plan language—they were more often looking for the Toll House chocolate-chip cookie recipe.

### c. No "presumption" of exposure applies here.

Although courts in rare circumstances may apply a presumption that class members saw and relied upon advertisements, the Ninth Circuit has "been careful to clarify" that the presumption applies only where "the defendant so pervasively disseminated material misrepresentations that *all* plaintiffs *must have been exposed* to them." *Walker v. Life Ins. Co. of the Sw.*, 953 F.3d 624, 631 (9th Cir. 2020) (emphases

added).  It is the plaintiff's burden to demonstrate that the defendant's advertising "was sufficiently pervasive to warrant a presumption" that all class members saw it.  *In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1111 (C.D. Cal. 2015); *accord, e.g.*, *In re Clorox Consumer Litig.*, 301 F.R.D. 436, 445–46 (N.D. Cal. 2014) ("Without any evidence that . . . consumers actually saw [the representations], Plaintiffs have no basis for their claim that Clorox presented a uniform message to its customers.").

Rather than provide any evidence of exposure, Falcone asks this Court to *assume* that all class members were "exposed to the same" representations.  Mem. 27.  The fact that there are 59 different labels proves they were not.  And Falcone offers no evidence that information about "sustainability" was "pervasively disseminated" to consumers, a prerequisite for application of that presumption.  *Walker*, 953 F.3d at 631.  Nestlé USA never ran "the kind of massive advertising campaign" courts typically look to when presuming exposure.  *Mazza*, 666 F.3d at 596.  ██████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ███████████████████████████████████████████████████ ██████  That falls far short of the kind of exposure required to invoke a presumption of reliance.  *See Mazza*, 666 F.3d at 595.

**2.      Consumers do not have a "common" understanding of the labels.**

Falcone challenges a range of representations—such as "sustainably sourced" and "improving the lives of farmers"—that have no fixed meaning.  Falcone seems to recognize as much, claiming that ██████████████████████████████████ Mem. 12.  The lack of a uniform definition means Falcone cannot show that consumers understand these representations in the same way.

"Where plaintiffs fail to establish a controlling definition for a key term in an alleged misstatement, courts have found that materiality is not susceptible to common

proof." *In re 5-Hour Energy Mktg. & Sales Pracs. Litig.*, 2017 WL 2559615, at *8 (C.D. Cal. June 7, 2017) (collecting cases).   Commonality and predominance are thus not satisfied if a plaintiff does not provide "any kind of uniform definition among class members" of the challenged representations.  *Astiana v. Kashi Co.*, 291 F.R.D. 493, 508 (S.D. Cal. 2013).   No such uniform definition can be established for "inherently ambiguous" label claims, *Vizcarra*, 339 F.R.D. at 547, or for terms that have "no fixed meaning," because "consumers' understanding of those representations would not be" uniform, *Jones*, 2014 WL 2702726, at *14.

Evidence confirms that consumers have a wide range of interpretations of words like "sustainable." ███████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ This aligns with academic literature, which shows that consumers lack a uniform understanding as to "what the concept of 'sustainability' encompasses."  Kivetz ¶ 151.

Surveys run by Dr. Kivetz likewise demonstrate that, in the context of the specific products and representations Falcone's counsel challenges, only 1–3% of consumers understood the labels as making any claim about child labor or more general humanitarian practices.  Kivetz ¶¶ 132–35.  Instead, consumers were likely to "vary in their interpretation (if any) of these claims."  *Id.* ¶ 143.  These results are not surprising: Falcone herself "never once thought of child slave labor" when she saw the labels. Loose, Ex. 2 95:15–17.  That Falcone disagrees with her own lawyers' interpretation of the labels underlines just how little common understanding there is.

The motion makes much of the fact that Nestlé USA uses the words "sustainable sourcing," "responsible sourcing," and "ethical sourcing" interchangeably in some

internal documents. Mem. 4–6. But the question for class certification is what words were actually used on the labels, and whether *consumers* have a "uniform definition" of those words—not how Nestlé USA employees use words in internal emails. *Astiana*, 291 F.R.D. at 508. Phrases like "ethical sourcing" never appeared on the labels. And to the extent consumers even would have seen any of the small-text, back-of-label references to "sustainably sourced" on a minority of the labels at issue, the evidence shows they have no common understanding of what that phrase means.

### 3. There is no evidence of classwide materiality or reliance.

If an alleged misrepresentation "is not material as to all class members, the issue of reliance would vary from consumer to consumer and the class should not be certified" as to any CLRA claims. *Stearns*, 655 F.3d at 1022–23.

The evidence in this case establishes that the representations Plaintiff's counsel fixate on are not material to class members. Most consumers could not have found those representations to be material because they either did not see them, *supra* at 16–19, or because they did not understand those representations to mean what Plaintiff's counsel say they mean, *supra* at 19–21. As Falcone herself repeatedly testified, these back-of-label representations are not "the deciding factor" for consumers. Loose, Ex. 2 at 198:25–199:8, 200:16–20, 208:21–209:3.

Studies back up this testimony from Falcone. Dr. Kivetz showed different groups of consumers versions of Toll House and hot cocoa labels that did, and did not, have the Nestlé Cocoa Plan emblem and related representations, and then compared consumers' stated willingness to buy the product and how much they would be willing to pay. Kivetz ¶ 177. The results demonstrate that those representations "do not materially increase consumers' likelihood of purchasing, or willingness to pay for" these products. *Id.* ¶ 175. Much like Falcone, most consumers buy Nestlé USA chocolate products "for a variety of factors" unrelated to the challenged claims, like brand loyalty. *Id.*

███████████████████████████████████████████

███████████████████████████████████████████

1

2  All of the evidence suggests that the claims on which this case turns are simply not

3  important to consumers' purchasing decisions.

4       The motion ignores these studies and instead offers general statistics about how

5  important consumers say "sustainability" is to them in the abstract, outside the context

6  of the labels at issue here. Mem. 6–11. But, as the Ninth Circuit recently explained,

7  generic statistics like this are not helpful because they do not "adequately address the

8  primary question in this case," which is "how the 'reasonable consumer' understands

9  the [challenged claims] *in the context of the products*." *McGinity v. Procter & Gamble*

10  *Co.*, 69 F.4th 1093, 1099 (9th Cir. 2023) (emphasis added).

11       Most of the statistics Falcone cites are not particular to Nestlé USA consumers.

12  In fact, many of them are not even specific to chocolate products. For example, Falcone

13  claims that Nestlé USA "admits" that sustainability "win[s] with consumers, drive[s]

14  value, manage[s] risk, and build[s] trust." Mem. 9. But the statement on which she

15  relies was part of a presentation specifically about the *dairy* industry. Dkt. 125-2, Ex. 33

16  at 10, 12–16. Likewise, Falcone cites surveys suggesting that some consumers "expect

17  companies to invest in sustainability" and that "87% of households say companies have

18  a responsibility to take care of the planet and its people." Mem. 6–7. But, at most, these

19  statistics suggest that some consumers care about "sustainability" in the abstract—not

20  that anyone bought *these* Nestlé USA products *because of* small, back-of-label text that

21  mentions the Nestlé Cocoa Plan. By contrast, when these labels are studied, the evidence

22  shows that the challenged statements either go unnoticed or are not motivating to

23  customers. *See supra* at 16–21.

24       The few statistics Falcone offers that go to purchasing decisions are similarly

25  generalized. Falcone cites a study claiming that "50% of sustainability-marketed

26  products were responsible for 50% of market growth among CPG [consumer product

27  goods] brands." Mem. 8. But Falcone does not explain what it means for a product to

28  be "sustainability-marketed," whether this study had anything to do with chocolate, or

any other details that would allow this Court to connect this study to the labels at issue in this case. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████ Further, evidence shows there is a "say versus do" gap, wherein consumers who profess to care about "ethical consumption" in studies like this do not follow through when in the grocery store.  Kivetz ¶¶ 220–22.

Falcone also cherry-picks the data, ignoring language in the studies she relies upon that directly undermines her argument. ██████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

███████████████████████████████████████████ *see* Kivetz ¶ 225.

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████   ███████████████

████████████████████████████████████████████████████████

██████████████████████████ When studies looked at real-world labels, or asked for a comparison between claims about the Cocoa Plan and other non-challenged statements on the package, ████████████████████████████████████

███████████████████████████████

Finally, even if this Court were to give any weight to Plaintiff's generalized statistics, they actually show why this Court *cannot* presume materiality; even those statistics make clear that a substantial portion—in many instances, a majority—of consumers do *not* factor "sustainability" into their purchasing decisions.  For instance:

- Falcone claims that 29% of consumers "always" or "usually" base their purchasing decisions on "concerns for issues such as the environment and social

well-being." Mem. 7. This general survey thus suggests that 71% of consumers do *not* usually base their purchasing decisions on such concerns.

- Falcone claims that "33% of consumers are already making purchasing decisions with sustainability in mind"—meaning 67% of consumers are not. Mem. 8.

Under the weight of contrary evidence, Falcone's fallback argument is to ask the Court to "infer[]" materiality and reliance. Mem. 27. That does not work because, as noted, that presumption applies *only* where there are "pervasively disseminated material misrepresentations," which Falcone cannot show here. *Walker*, 953 F.3d at 631; *supra* at 18–19. And even if the presumption could apply here, it is plainly rebutted by evidence showing that most consumers were not exposed to the representations Falcone challenges, did not interpret them to refer to child labor, and did not find them to be important in their purchasing decisions. *Supra* at 16–22; *Algarin*, 300 F.R.D. at 453 ("[T]he Court does not need to infer reliance given the evidence presented."); *Gonzalez v. Proctor & Gamble Co.*, 247 F.R.D. 616, 624 (S.D. Cal. 2007) ("[T]he plaintiffs could not allege that the same representations were specifically made to each class member, thus preventing the court from permitting an inference of reliance.").

### 4. There is no way to identify purportedly injured class members.

Under the "predominance" prong of Rule 23(b)(3), a class cannot be certified if "figuring out whether each individual putative class member was harmed would involve an inquiry specific to that person." *Lara v. First Nat'l Ins. Co. of Am.*, 25 F.4th 1134, 1139 (9th Cir. 2022). Moreover, if a class "include[s] a great number of members who for some reason could not have been harmed by the defendant's allegedly unlawful conduct, the class is defined too broadly to permit certification." *Olean*, 31 F.4th at 669 n.14. While there is no rigid quota or number, other courts have reasoned—applying the same principle from *Olean*—that classes containing 10–15% uninjured class members cannot be certified. *See In re Asacol Antitrust Litig.*, 907 F.3d 42, 51 (1st Cir. 2018) (certification not appropriate where "approximately ten percent of the class was uninjured"); *In re Rail Freight Fuel Surcharge Antitrust Litig.*, 934 F.3d 619, 624 (D.C.

Cir. 2019) (denying certification where "12.7 percent" of class was uninjured).

Even if there were some small handful of consumers who were allegedly injured in the way Plaintiff's counsel suggests, they propose no feasible way of figuring out *who* those consumers are, or how to separate them from the much larger group of consumers for whom these representations were immaterial or irrelevant.

The proposed classes contain large numbers of uninjured consumers. Consumers who never saw the representations the motion challenges, *supra* at 16–19, did not understand those representations to make any promises about child labor or the environment, *supra* at 19–21, or did not find those representations material to their purchasing decision, *supra* at 21–24, could not have been harmed in the way the motion alleges. The same goes for consumers (like Falcone) who would have thought the Cocoa Plan has delivered on the challenged representations based on the $250 million it has spent in its efforts. *See Moheb v. Nutramax Lab'ys Inc.*, 2012 WL 6951904, at *4 (C.D. Cal. Sept. 4, 2012) ("[T]he existence of economic injury is also not a common question, because many purchasers are satisfied."); *Algarin*, 300 F.R.D. at 457 (same).

"When a defendant substantiates such an individualized issue in this way, the district court must determine whether the plaintiff has proven by a preponderance of the evidence that . . . a class-member-by-class-member assessment of the individualized issue will be unnecessary or workable." *Van v. LLR, Inc.*, 61 F.4th 1053, 1069 (9th Cir. 2023). Far from proving a workable way of identifying harmed class members, Falcone has provided *no argument* as to how to address these numerous individualized issues or how to identify those few consumers who may be harmed under her theory. Because Falcone proposes no method for separating those uninjured consumers from other consumers who may have been deceived, her class cannot be certified.

**C.    There Is No Evidence of Damages.**

Before certifying a class seeking damages under Rule 23(b)(3), a court must conduct a "rigorous analysis" to determine whether the plaintiff has offered a damages model that is both "consistent with its liability case" and demonstrates "that damages

are susceptible of measurement across the entire class." *Comcast*, 569 U.S. at 35. For consumer-deception claims, a damages model typically approximates "what a purchaser would have paid at the time of purchase had the purchaser received all the information." *Pulaski & Middleman, LLC v. Google, Inc.*, 802 F.3d 979, 989 (9th Cir. 2015).

The motion offers no damages model at all, instead claiming—without pointing to any supporting evidence—that *all* consumers would think Nestlé USA products are "worthless" if there is *any* risk of child labor or environmental harm in the supply chain. Falcone's testimony and the evidence in this case directly contradicts that assertion, and this is not one of the rare cases where a "full refund" damages model is appropriate.

### 1. There is no common evidence of classwide damages.

Plaintiff's counsel's theory of injury in this case appears to be that *all* consumers "are demanding sustainability and making conscious purchasing decisions," and therefore *no* consumer would have bought Nestlé USA products if they knew there were any risks of child labor in the supply chain. Mem. 28–29. Yet they have "presented no evidence that this injury is capable of common proof," nor made a showing that "the asserted economic injury can be proven on a classwide basis." *Silva v. B&G Foods, Inc.*, 2022 WL 4596615, at *2 (N.D. Cal. Aug. 26, 2022) (denying certification based on failure to substantiate a full-refund damages claim). To the contrary, the evidence suggests there are *no* damages in this case at all. *See supra* at 21–24; Kivetz ¶ 21.

Moreover, Falcone's own testimony undermines her lawyers' theory. Falcone bought chocolate products even *after* learning about the allegations in this case—that is, after she learned there was a risk those products contained cocoa that had been produced with child labor—simply because she "love[s]" the taste. *See* Loose, Ex. 2 41:5–42:11. Falcone's decision to keep buying chocolate purely for its "culinary value" flatly contradicts her lawyers' attempt to now say that any value from those products is "de minimis" and that they are otherwise "worthless." Mem. 29. Moreover, that this kind of knowing purchase would count as an "injury" shows just how nonsensical the proposed damages methodology is. *See Olean*, 31 F.4th at 666 n.9 (damages evidence

is inadequate if it "demonstrate[s] nonsensical results such as false positives, i.e., injury to class members who could not logically have been injured by a defendant's conduct").

Survey evidence confirms that there are no damages here.  When consumers are shown versions of Nestlé USA labels without the Cocoa Plan emblem and challenged representations, they are just as likely to buy the product, and are willing to pay just as much.  Kivetz ¶¶ 189–209.  Other courts have reasoned that a plaintiff cannot show evidence of classwide damages when faced with a similar survey that showed no difference in purchasing behavior when the challenged statements were removed from the package.  *See Silva*, 2022 WL 4596615, at *3.  The same holds true here.

### 2.      A "full refund" damages methodology is unsupportable.

In rare cases involving sham products like health care supplements that are nothing more than sugar pills, courts sometimes allow plaintiffs to use a "full refund" damages model.  *See, e.g.*, *Capaci v. Sports Rsch. Corp.*, 2022 WL 1133818, at *15 (C.D. Cal. Apr. 14, 2022) (fake weight-loss pills); *Allen v. Hyland's Inc.*, 300 F.R.D. 643, 671 (C.D. Cal. 2014) (fraudulent homeopathic medicine); *Korolshteyn v. Costco Wholesale Corp.*, 2017 WL 1020391, at *7 (S.D. Cal. Mar. 16, 2017) (sham gingko supplements).  But, as one of the cases Falcone relies upon in her motion makes clear, "the full refund model is not appropriate in mislabeled food and beverage cases, because the model fails to take into account that consumers still received some benefit when they consumed the product."  *Capaci*, 2022 WL 1133818, at *16 (alterations omitted).

Here, consumers received benefit from Nestlé USA's chocolate products, and they got a product that Falcone says "really taste[s] better" than other brands.  Loose, Ex. 2 108:13–109:3.  Even adopting Falcone's argument, the on-label representations "would not necessarily render the Products worthless if invalidated" because consumers still received high-quality, delicious chocolate.  *Allen v. Similasan Corp.*, 306 F.R.D. 635, 650 (S.D. Cal. 2015) (cited at Mem. 29).

This is not an issue of "damages calculations alone" getting in the way of certification; Falcone has not even bothered to propose a "valid method" explaining *how*

she could accurately calculate damages. *Lambert v. Nutraceutical Corp.*, 870 F.3d 1170, 1182 (9th Cir. 2017), *rev'd on other grounds*, 139 S. Ct. 710. She thus has not satisfied the requirements of *Comcast*, providing an independent reason to deny certification of a damages class under Rule 23(b)(3).

## D.   Falcone Cannot Certify a Rule 23(b)(2) Class Seeking Injunctive Relief.

Falcone's fallback request for a Rule 23(b)(2) class does not work because she does not satisfy the "typicality" and "commonality" requirements of Rule 23(a), and those must be met to certify an injunctive-relief class. *Supra* at 12–24. Moreover, Falcone does not have standing to seek injunctive relief. To represent a Rule 23(b)(2) class, a named plaintiff herself must have standing to seek injunctive relief, which requires her to demonstrate "a real and immediate threat of repeated injury." *Davidson v. Kimberly-Clark Corp.*, 889 F.3d 956, 967 (9th Cir. 2018). In the context of false-advertising claims, a plaintiff must show that she was deceived, would like to buy the product again in the future, but will have "no way of determining" whether the alleged deception has been fixed. *Id.* at 971.

Falcone's testimony establishes that she is not at risk of "repeated injury." She testified that she continued to buy chocolate after learning about the risks of child labor, is satisfied with what Nestlé Cocoa Plan is doing, and would happily buy products with the current labels. *See supra* at 7–9, 26. There is no world in which Falcone risks "a real and immediate threat" in light of this testimony. Nor is it true that she "cannot readily determine" what the Cocoa Plan is doing given that it publishes detailed annual reports. Mem. 3. Falcone thus does not have standing to seek future-looking injunctive relief, and cannot represent a class that seeks the same.

## V.  CONCLUSION

Falcone's motion for class certification asks this Court to assume that all consumers who bought 59 different labels saw the same thing, came to the same conclusions about what those labels meant, and were supposedly duped into buying one of the country's best-selling chocolate brands. Evidence shows that this theory is

baseless.  And Falcone's own testimony shows that even she does not believe it.  This Court should deny the motion and, in light of Falcone's demonstrated lack of standing, resolve this case by dismissing her claims entirely.

Dated:  February 23, 2024        Respectfully submitted,

By: /s/ *Timothy W. Loose*
     Timothy W. Loose
*Counsel for Defendant Nestlé USA, Inc.*

## Appendix A:  Chart of Challenged Labels and Statements

| # | Bates-Stamped Package Flat | Nestlé Package/Label Variant | First Date Sold | Front: Nestlé Cocoa Plan | Front: Responsibly Sourced | Front: Sustainably Sourced | Front: UTZ | Back: Nestlé Cocoa Plan | Back: Responsibly Sourced | Back: Sustainably Sourced | Back: Sustainably Harvested Cocoa Beans | Back: Improve[s] the Lives of Cocoa Farmers | Back: Better Lives | Back: Rainforest Alliance | Back: UTZ |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | **Chocolate Morsels** | | | | | | | | | | | | | | |
| 1 | FALCONE_NUSA_062503 | Mini Semi-Sweet Morsels 10 oz | 7/31/17 | ✔ | | | | ✔ | | | | | | | |
| 2 | FALCONE_NUSA_062505 | Mini Semi-Sweet Morsels 10 oz | 11/21/18 | | | | | ✔ | | | | | | | |
| 3 | FALCONE_NUSA_062544 | Mini Semi-Sweet Morsels 10 oz | 10/20/20 | | | | | ✔ | ✔ | | | | | | |
| 4 | FALCONE_NUSA_062568 | Mini Semi-Sweet Morsels 10 oz | 12/9/21 | | | | | ✔ | ✔ | | | | | | |
| 5 | FALCONE_NUSA_062563 | Mini Semi-Sweet Morsels 20 oz | 10/17/17 | ✔ | | | | ✔ | | ✔ | | | | | ✔ |
| 6 | FALCONE_NUSA_062564 | Mini Semi-Sweet Morsels 20 oz | 11/26/18 | | | | | ✔ | | | | | | | |
| 7 | FALCONE_NUSA_062565 | Mini Semi-Sweet Morsels 20 oz | 10/10/20 | | | | | ✔ | ✔ | | | | | | |
| 8 | FALCONE_NUSA_062567 | Mini Semi-Sweet Morsels 20 oz | 11/27/21 | | | | | ✔ | ✔ | | | | ✔ | ✔ | ✔ |
| 9 | FALCONE_NUSA_062506 | Dark Chocolate Morsels 10 oz | 4/20/15 | ✔ | | | | ✔ | | | | | | | |
| 10 | FALCONE_NUSA_062537 | Dark Chocolate Morsels 10 oz | 6/13/16 | ✔ | | | | ✔ | | | | | ✔ | ✔ | |
| 11 | FALCONE_NUSA_062521 | Dark Chocolate Morsels 10 oz | 10/28/17 | ✔ | | | | ✔ | | | | | ✔ | | ✔ |
| 12 | FALCONE_NUSA_062532 | Dark Chocolate Morsels 10 oz | 11/24/18 | | | | | ✔ | | | | | ✔ | | ✔ |
| 13 | FALCONE_NUSA_062572 | Dark Chocolate Morsels 10 oz | 12/22/21 | | | | | ✔ | ✔ | | | | | | ✔ |
| 14 | FALCONE_NUSA_062562 | Dark Chocolate Morsels 10 oz | 9/3/22 | | | | | ✔ | ✔ | | | | | | |
| 15 | FALCONE_NUSA_062507 | Dark Chocolate Morsels 20 oz | 5/4/15 | ✔ | | | | ✔ | | | | | ✔ | ✔ | |
| 16 | FALCONE_NUSA_062535 | Dark Chocolate Morsels 20 oz | 6/14/16 | ✔ | | | | ✔ | | | | | ✔ | ✔ | |
| 17 | FALCONE_NUSA_062522 | Dark Chocolate Morsels 20 oz | 10/28/17 | ✔ | | | | ✔ | | | | | ✔ | | ✔ |
| 18 | FALCONE_NUSA_062531 | Dark Chocolate Morsels 20 oz | 11/24/18 | | | | | ✔ | ✔ | | | | | | ✔ |
| 19 | FALCONE_NUSA_062573 | Dark Chocolate Morsels 20 oz | 12/22/21 | | | | | ✔ | ✔ | | | | | | ✔ |
| 20 | FALCONE_NUSA_062508 | Milk Chocolate Morsels 11.5 oz | 3/30/15 | ✔ | | | | ✔ | | | | | ✔ | ✔ | |
| 21 | FALCONE_NUSA_062526 | Milk Chocolate Morsels 11.5 oz | 6/14/16 | ✔ | | | | ✔ | | | | | ✔ | | ✔ |
| 22 | FALCONE_NUSA_062523 | Milk Chocolate Morsels 11.5 oz | 1/17/18 | ✔ | | | | ✔ | | | | | ✔ | | ✔ |
| 23 | FALCONE_NUSA_062530 | Milk Chocolate Morsels 11.5 oz | 11/23/18 | | | | | ✔ | | | | | ✔ | | ✔ |
| 24 | FALCONE_NUSA_062553 | Milk Chocolate Morsels 11.5 oz | 10/10/20 | | | | | ✔ | ✔ | | | | | | ✔ |
| 25 | FALCONE_NUSA_062574 | Milk Chocolate Morsels 11.5 oz | 12/9/21 | | | | | ✔ | ✔ | | | | ✔ | ✔ | ✔ |
| 26 | FALCONE_NUSA_062509 | Milk Chocolate Morsels 23 oz | 3/30/15 | ✔ | | | | ✔ | | | | | ✔ | | ✔ |
| 27 | FALCONE_NUSA_062517 | Milk Chocolate Morsels 23 oz | 8/13/15 | ✔ | | | | ✔ | | | | | ✔ | | ✔ |
| 28 | FALCONE_NUSA_062533 | Milk Chocolate Morsels 23 oz | 1/17/18 | ✔ | | | | ✔ | | | | | ✔ | | ✔ |
| 29 | FALCONE_NUSA_062560 | Milk Chocolate Morsels 23 oz | 1/12/18 | ✔ | | | | ✔ | | | | | ✔ | | ✔ |
| 30 | FALCONE_NUSA_062529 | Milk Chocolate Morsels 23 oz | 11/24/18 | | | | | ✔ | ✔ | | | | | | ✔ |
| 31 | FALCONE_NUSA_062558 | Milk Chocolate Morsels 23 oz | 10/20/20 | | | | | ✔ | ✔ | | | | | | ✔ |
| 32 | FALCONE_NUSA_062557 | Milk Chocolate Morsels 23 oz | 11/27/21 | | | | | ✔ | ✔ | | | | ✔ | ✔ | ✔ |
| 33 | FALCONE_NUSA_062499 | Semi-Sweet Morsels 12 oz | 11/21/18 | | | | | ✔ | ✔ | | | | | | |
| 34 | FALCONE_NUSA_062542 | Semi-Sweet Morsels 12 oz | 10/20/20 | | | | | ✔ | ✔ | | | | ✔ | ✔ | |
| 35 | FALCONE_NUSA_062575 | Semi-Sweet Morsels 12 oz | 12/9/21 | | | | | ✔ | ✔ | | | | | | ✔ |
| 36 | FALCONE_NUSA_062493 | Semi-Sweet Morsels 72 oz | 10/3/17 | ✔ | | ✔ | ✔ | ✔ | | ✔* | | ✔ | | | ✔ |
| 37 | FALCONE_NUSA_062569 | Semi-Sweet Morsels 72 oz | 12/18/18 | | | | | ✔ | | ✔* | | ✔ | | | ✔ |
| 38 | FALCONE_NUSA_062497 | Semi-Sweet Morsels 72 oz | 7/17/19 | ✔ | | ✔ | ✔ | ✔ | | ✔* | | ✔ | | | ✔ |
| 39 | FALCONE_NUSA_062548 | Semi-Sweet Morsels 72 oz | 7/3/20 | ✔ | ✔ | | ✔ | ✔ | | ✔* | | ✔ | | | ✔ |
| 40 | FALCONE_NUSA_062555 | Semi-Sweet Morsels 72 oz | 10/10/20 | ✔ | ✔ | | ✔ | ✔ | | ✔* | | ✔ | | | ✔ |
| 41 | FALCONE_NUSA_062546 | Semi-Sweet Morsels 72 oz | 10/20/20 | ✔ | ✔ | | ✔ | ✔ | | ✔* | | ✔ | | | ✔ |
| 42 | FALCONE_NUSA_062576 | Semi-Sweet Morsels 72 oz | 12/24/21 | ✔ | ✔ | | | ✔ | | ✔ | | ✔ | ✔ | ✔ | ✔ |
| 43 | FALCONE_NUSA_062570 | Semi-Sweet Morsels 72 oz | 12/24/21 | ✔ | ✔ | | | ✔ | ✔ | | | ✔ | | | ✔ |
| 44 | FALCONE_NUSA_062540 | Semi-Sweet Morsels 72 oz | 6/2/22 | ✔ | ✔ | | | ✔ | | | | ✔ | | | ✔ |
| | **Hot Cocoa Mix** | | | | | | | | | | | | | | |
| 45 | FALCONE_NUSA_062512 | Mini Marshmallows 6 pack | 12/14/17 | | | | | | ✔ | | | ✔ | | ✔ | |
| 46 | FALCONE_NUSA_062541 | Mini Marshmallows 6 pack | 1/31/22 | | | | | ✔ | ✔ | | | ✔ | | | |
| 47 | FALCONE_NUSA_000028 | Mini Marshmallows 8 pack | 6/17/22 | | | | | ✔ | ✔ | | | ✔ | | ✔ | |
| 48 | FALCONE_NUSA_062498 | Rich Milk Chocolate 6 pack | 12/14/17 | | | | | ✔ | | | | ✔ | | | |
| 49 | FALCONE_NUSA_062550 | Rich Milk Chocolate 6 pack | 1/31/22 | | | | | ✔ | ✔ | | | ✔ | | | |
| 50 | FALCONE_NUSA_000030 | Rich Milk Chocolate 8 pack | 6/16/22 | | | | | ✔ | | | | ✔ | | | |
| 51 | FALCONE_NUSA_000026 | Rich Milk Chocolate 27.7 oz | 12/14/17 | | | | | ✔ | | | | ✔ | | | |
| | **Nesquik** | | | | | | | | | | | | | | |
| 52 | FALCONE_NUSA_074000 | Nesquik Powder 16 oz | 7/6/15 | | | | | ✔ | | | | ✔ | | | |
| 53 | FALCONE_NUSA_074010 | Nesquik Powder 16 oz | 6/23/16 | | | | | ✔ | | | | ✔ | | | |
| 54 | FALCONE_NUSA_073998 | Nesquik Powder 41.9 oz | 5/3/15 | | | | | ✔ | | | | ✔ | | | |
| 55 | FALCONE_NUSA_074019 | Nesquik Powder 41.9 oz | 6/23/16 | | | | | ✔ | | | | | | ✔ | |
| 56 | FALCONE_NUSA_074024 | Nesquik Powder 41.9 oz | 5/2/17 | | | | | ✔ | | | | | ✔ | ✔ | |
| 57 | FALCONE_NUSA_074026 | Nesquik Powder 18.7 oz | 4/7/17 | | | | | ✔ | | | | | | | |
| 58 | FALCONE_NUSA_073983 | Nesquik Powder 18.7 oz | 12/13/17 | | | | | ✔ | | | | | | | |
| 59 | FALCONE_NUSA_074017 | Nesquik Powder 9.3 oz | 5/3/15 | | | | | ✔ | | | | | | | |

\* "sustainable cocoa production"